27SEPT05.txt

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2                          BOSTON DIVISION

 3

 4   COLOR KINETICS, INCORPORATED, .
              Plaintiff             .
 5                                  .
                   vs.              .    1:03-CV-12491-MEL
 6                                  .
                                    .    Tuesday, September 27, 2005
 7   TIR SYSTEMS, LTD.,             .    Courtroom 8
              Defendant             .    1 Courthouse Way
 8                                  .    Boston, MA. 022110

 9

10              TRANSCRIPT OF MOTION TO COMPEL

11          BEFORE THE HONORABLE MORRIS E. LASKER
                 UNITED STATES DISTRICT JUDGE
12

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:
        LOWRIE, LANDO and ANASTASI, LLP
15      BY:  Aaron W. Moore, Esq., and Matthew B. Lowrie,
        Esq.
16      Riverfront Office Park
        One Main Street
17      Cambridge, MA. 02142

18   FOR THE DEFENDANT:
        WILMER, CUTLER, PICKERING, HALE and DORR, LLP
19      BY:  Mark G. Matuschak, Esq.
        60 State Street
20      Boston, MA. 02109

21

22   Court Reporter:              Niles Jon Fowlkes, RMR
                                  20 Malverna Road
23                                Roslindale, MA. 02131-4512
                                  Tel.  617-469-0756
24

25     Proceedings Reported by Stenotype, Transcript Produced By
                  Computer-Aided Transcription.
```

2

```
                        27SEPT05.txt
1                        I N D E X

2

3   Mr. Matuschak -  3, 13, 15, 20, 23

4   Mr. Moore     -  7, 8, 18, 21, 23

5   Mr. Lowrie    -  8, 14

6   The Court     -  5, 12, 15, 24

7

8

9

10

11

12

13

14

15

16

17

18                              * * *

19

20

21

22

23

24

25
```

                                                              3

```
1                  Tuesday, September 27, 2005
2
```

27SEPT05.txt

3

4    AFTERNOON SESSION:

5    [Lobby Conference at 2:08 p.m.]

6            THE CLERK:  This is Civil Action 03-12491, Color

7    Kinetics, Incorporated v. TIR Systems, LTD.

8            Would the counsel please identify themselves and

9    who they represent for the record.

10           MR. MOORE:  Aaron Moore for Color Kinetics.

11           MR. LOWRIE:  And also Matthew Lowrie for Color

12   Kinetics.

13           MR. MATUSCHAK:  Mark Matuschak for TIR.

14           THE COURT:  All right.

15           I've just been reading a memo that Susan [law

16   clerk] put together on this, and, as I see it, the question

17   is who goes first.

18           MR. MATUSCHAK:  Well, that's the question I think

19   on this invalidity part.

20           THE COURT:  Yes.

21           MR. MATUSCHAK:  On the infringement part, I think,

22   it's more or less the same issue that we were here about

23   last year, which is:  What -- what is the scope?  Is it, you

24   know, if your Honor would remember, last year when we came

25   in, we had a complaint that had been served, that had

4

1    patents with, I think, over 150-some claims, and no

2    identification of which ones were at issue or what products

3    were at issue, and a very broad set of discovery papers

4    looking for discovery on -- on sort of the universe of

Page 3

27SEPT05.txt

5   things that might potentially infringe.

6          And we had the argument in front of your Honor

7   last year about the idea that it was the plaintiff's

8   obligation to, at least, give us some indication of what

9   claims they were asserting, and what products were being

10  accused so we could focus discovery, and we wouldn't have

11  the kind of discovery battles that I think your Honor is so

12  fond of.

13         I think we're sort of back to that step again,

14  because what happened is they provided us with the claims

15  chart, which identified a certain number of those claims

16  that they asserted we were infringing, and they accused one

17  of our products.  We're not here about that product; we've

18  given them discovery about that.

19         What they now say is, "Well, we want discovery

20  about all your other products."

21         THE COURT:  Really?

22         MR. MATUSCHAK:  Yes.

23         And that is, uh, that's the issue that we're

24  certainly working with.  We say, "Wait a second.  We've

25  already done this."


                                                          5

1          THE COURT:  Give me some feel of the volume -- the

2   number of products that exist in this situation.

3          MR. MATUSCHAK:  Well, it's a relatively small

4   number of products.  It's probably, you know, the products,

5   maybe ten to --

6          THE COURT:  I mean, I just had a case involving --

Page 4

27SEPT05.txt

7   against Nike, which I decided in favor of Nike, where the

8   plaintiff was a school teacher who had invented a shoe under

9   his patent that he claimed was violated by Nike, and then he

10  said to Nike, "I'd like to know how many shoes you've got

11  that might violate my patent." And Nike says, "The hell

12  with you; go out and buy them in the stores and you'll find

13  out." And I ruled against Nike on that, although,

14  ultimately I ruled in Nike's favor on the patent issue.

15          But they had something like 150 different shoes

16   which used, you know, these bubbles and things that they

17   use in fancy shoes, which gave me a little background for a

18   case like this. But I'm confused as why this is such a big

19   problem if there is a limited, small number of possible

20   items.

21          MR. MATUSCHAK: Because we're -- I mean, we're a

22  relatively small company, and that virtually is the --

23          THE COURT: But in actual numbers what are you

24  talking about? I don't mean to --

25          MR. MATUSCHAK: It's not -- I think the numbers

6

1   are probably in the range of ten products --

2          THE COURT: Yeah.

3          MR. MATUSCHAK: -- but the point is that they

4   operate -- at least, we believe they all operate

5   differently. They have taken this step of gone -- taking

6   one product and preparing the infringement chart. So now we

7   have a very focussed -- we can focus in discovery on that.

8          THE COURT: I mean, I can understand why you don't

27SEPT05.txt

 9   -- no defendant would be affirmatively anxious to put all of
10   their products before a plaintiff in a case like this,
11   because it can lead -- obviously lead to further claims; on
12   the other hand, I think the cases do say that as long as the
13   situation is reasonably controlled by the Court, just
14   because you just name one product to begin with doesn't mean
15   you don't have the right to find out if there are others, as
16   well.
17            MR. MATUSCHAK:  Well, with all due respect, your
18   Honor, I think -- I mean, that's exactly the issue I think
19   that the federal circuit addressed in, I think, in one of
20   the cases that was cited in our papers, where they said
21   specifically -- and this is the Micron motion case -- that
22   the discovery rules are designed to assist a party to prove
23   a claim that it reasonably believes to be viable without
24   discovery, not to find out if it has a basis for a claim.
25   And they have said in their reply papers, "We can't tell.

                                                          7

 1   We have no idea whether this infringes or not until we see
 2   all of your documents."  And it seems to me that is sort of
 3   a classics fishing expedition kind of thing.  It's not:
 4   Well, we're missing this one piece of information, and we
 5   think they infringed, and here's, you know, the other
 6   products, and we think they infringed because of these
 7   reasons but this one thing we can't really figure out
 8   without discovery.  It's just we can't figure out if we
 9   infringe or not; give us all the information about it and
10   then -- then we'll tell you.  And that really falls, in my

                              Page 6

27SEPT05.txt

11  view, into the more of a fishing expedition kind of

12  circumstance.

13          THE COURT:  Well, it certainly would in other

14  fields, there's no question about that.  I have to

15  familiarize myself more fully with the federal circuit's

16  approach, because, of course, they are the people that call

17  the shots on this, and I know that whatever I do they will

18  reverse, so I've got to anticipate that.

19  [Laughter.]

20          MR. MOORE:  Well, if I might speak to it, your

21  Honor --

22          THE COURT:  You guys, I mean, had another big case

23  before me in which you have been the reasonable people.  Are

24  you the reasonable people in this case or the unreasonable

25  ones?

8

1   [Laughter.]

2           MR. MOORE:  Absolutely we're the reasonable

3   people.

4           MR. LOWRIE:  I'm hoping in the end we'll all be

5   reasonable, your Honor.  I don't expect the same level of

6   discourse in this case as in the other one.

7           THE COURT:  No, I don't think we'll ever have

8   another one like that.

9           MR. LOWRIE:  Hope not.

10          MR. MOORE:  We think it's not as broad a discovery

11  request as TIR would have the Court believe.  TIR has

12  essentially two overarching lines of products.  One is sort

Page 7

27SEPT05.txt

13  of a conventional lightbulb-type product, R-clamps and
14  things like that, the sort of thing that you would see in a
15  gymnasium or in a highway underpass.  Those are not what
16  we're interested in.
17          They have a second line of products that they call
18   SSL.  These are solid state devices, which would include
19   the LED kinds of devices that were, uh, that are involved
20   in these patents.
21          THE COURT:  All right.
22          MR. MOORE:  Within that second group of products,
23  which is actually, as I understand it, according to their
24  most recent annual report, a brand new product line that
25  came out last year.  There are four lines of products in

                                                    9

1   there.  One is called ColorTrace, one is called LightScript,
2   one is called LightMark and one is called Destiny.  The
3   first three we're not interested in either, because those
4   are LED products that are just a constant color; they don't
5   change at all.
6           So, for the products that we're able to see on the
7    Web site, at least, we're only interested in the Destiny
8    product line, which are one, two, three, four, five, six --
9    there are eight products in the Destiny product line, one
10   of which is the Destiny CW product.  That's a product that
11   Color Kinetics was able to obtain a sample of and
12   disassemble and put into the claim chart that the Court
13   requested initially.  This is not the kind of product where
14   you can just go down to the store and buy it; I mean, this

27SEPT05.txt
15    is sold by TIR through a network of distributors.  Color
16    Kinetics would have a difficult time obtaining these --
17              THE COURT REPORTER:  I'm sorry.  I'm not hearing
18    you.
19              MR. MOORE:  Color Kinetics would have a difficult
20    time obtaining these products in the marketplace.
21              THE COURT:  All that you're asking them to do at
22    the moment is to deliver to you a specimen of those
23    products?
24              MR. MOORE:  Well, we'd like a specimen; we'd also
25    like products that describe the operation of the products.



                                                          10

1              As the Court may be aware from the other case, you
2    know, this is not -- these patents are not about all
3    color-changing LED devices; they are about specific
4    applications of the color-changing LED devices.
5              And we had looked at the public information that
6    is available on the TIR Web site, for example, and it
7    doesn't provide the level of detail that would allow us to
8    read the claims on the products.  We -- we don't have any
9    other way to get that information short of discovery, which
10   is one of the reasons --
11             THE COURT:  Well, what makes you think that they
12   might be -- I think that counsel is correct that under, at
13   least, ordinary discovery rules, the party that wants the
14   information has to establish reason to believe that it may
15   fall within the class that he's looking at.  What makes you
16   think that it might?
                              Page 9

27SEPT05.txt

17          MR. MOORE:  Because it's our understanding, at
18    least, that these products are all related; they are sort of
19    different embodiments of the same kind of device.  One would
20    be a spot fixture, which is a circle, one would be a flood
21    fixture, which is a rectangle, one would be designed to
22    shoot up the side of a wall; but our assumption is that they
23    all have similar internal circuitry.  We don't know why a
24    company would completely design a lot of products where each
25    one was completely independent of the other and shared no

                                                              11

1    features.
2          THE COURT:  How precise is the description of the
3    material you are looking for?  I mean, I assume you have
4    gone beyond saying just give me any products that you make
5    so I can look.  How do you describe those that you are
6    looing for?
7          MR. MOORE:  Well, the sort of information that
8    we're looking for would be what we, you know, what we
9    included in the claim charts we provided where, for example,
10   the claim requires a processor, and so in the claim chart
11   for the product that we obtained we were able to open it up,
12   and see the processor, and point to it and figure out that
13   that's the function that that's --
14         THE COURT:  Yeah, but your notice of -- in your
15   notice for discovery, have you specified in any detail the
16   characteristics of the product that you're looking for?
17         MR. MOORE:  We asked for color-changing LED
18   products, which is how we classified it, because we

                         Page 10

27SEPT05.txt

19  weren't --

20          THE COURT:  And that's all?

21          MR. MOORE:  -- if we had -- if we had -- if we had

22  tried to identify more narrowly, we would have gotten -- we

23  would have said, "Well, we want color-changing LED products

24  that have a heat sync," and they would have said, "Well, we

25  don't have a heat sync" --


                                                        12

1           THE COURT REPORTER:  I'm sorry.  I didn't get the

2   last.

3           MR. MOORE:  Oh, I'm sorry.

4           So they would have said, "Well, we don't have --

5    you don't get any documents because we don't infringe; we

6    don't have the heat sync, we got no documents."

7           THE COURT:  Well, what would be your answer to

8    that?

9           MR. MOORE:  Well, we would say that "We think it

10  probably does have a heat sync, and that you're not being

11  fair with your -- with your characterization of it, and it's

12  up for us to determine if such and such a part is a heat

13  sync in the context of that product."

14          THE COURT:  There are two aspects to this, it

15  seems to me.  One is the actually mechanical aspect of

16  complying -- maybe three aspects -- the fishing expedition

17  part, the mechanical part, and the expense.  Now, at least

18  the mechanical and the expense can be separated out; that is

19  to say, I can envision that I could say that you can go

20  ahead, and if it turns out the things you are asking them to

27SEPT05.txt
21  deliver is not reasonably to be claimed to be an

22  infringement, you pay for the discovery.  I don't know how

23  much expense is expected to be incurred in this.  It's not a

24  lot of depositions or anything; it's an inspection of

25  equipment; right?



13

1            MR. MATUSCHAK:  Well, there's a lot of -- since

2   it's a new company, so most of the communications they do is

3   by e-mail, and I don't know how much the Court has dealt

4   with sort of e-mail discovery issues before, but it's a very

5   expensive process, trying to do searches of people's e-mails

6   and --

7            THE COURT:  So that's one of your considerations.

8            MR. MATUSCHAK:  That's one of our considerations.

9            THE COURT:  Well, that -- I think it's reasonable

10  here where you can tell whose approach is, how should I say,

11  has more merit to it, and they both have some merit, that

12  you wait the outcome, and I would decide who would have to

13  pay what when the time came as far as discovery.  That would

14  reduce at least some of the problems.  And then the question

15  is the mechanical ones of how many of these -- how specific

16  should you be before I require them to deliver anything.

17            MR. MATUSCHAK:  Well, and I think that's part of

18  the problem, because I think, as Mr. Moore already said, he

19  said, We're not claiming all color-changing LEDs violate our

20  patents.  And, in fact, if you look at the patent claims,

21  you won't see one that says all color-changing LEDs.  But

22  that's the way they phrased their discovery.

27SEPT05.txt

23          So, and what we have done -- I mean, it seems to
24     me it's incumbent on them to do more than what they have
25     done.  You can't say, "Well, we're assuming that all of

                                                          14

1      your products are designed the same way"; you have to take
2      at least the step that says, "Okay, we have been able to
3      find out these -- there's ten parts to this claim.  We can
4      figure out eight of them; here's the one piece we're
5      missing and can you give us, you know, that's the stuff
6      that we can't make this decision on."
7          And then to put that in front of your Honor.  It's
8      a very simple issue; we can figure out if it's -- if it's a
9      burdensome thing or not to provide, but sort of, "Well,
10     we're just assuming that everything is designed the same
11     way, and we've phrased this broadly, as broadly as we can,
12     so that we can pick up everything in case, your know,
13     there's some dispute about what, you know, some aspect is,"
14     puts us in the position of having to turn over virtually
15     everything about those products.
16          MR. LOWRIE:  Well, if I may, your Honor, that's
17     perfectly appropriate, and it's just like the Nike case.  We
18     have examined -- we went to the expense of acquiring and
19     examining and reverse engineering a Destiny -- their Destiny
20     series.  We got it, we believe it infringes, we've provided
21     a 65-page claim chart showing exactly why we think it
22     infringes.  One hundred percent of their color-changing
23     products prove to be infringing, at least in our view.
24     Understand there will be a bit of disagreement.

27SEPT05.txt
25              What TIR is inviting the Court to do is step us

                                                                15

1    down to, "Okay, now we want all those with heat syncs."
2    But to know if it has a heat sync, that claim is going to
3    have to construe heat sync within the meaning of the claim,
4    and we'll end up over and over again appearing in front of
5    the Court.  From my end, I'm perfectly comfortable that
6    their request is quite focussed and limited.  There is a
7    series of product, the only product that we've been able to
8    get, is covered by the patent, at least as we read the
9    patents.  So we should be able to, at least, take discovery
10   on the series, rather -- of products rather than having to
11   come and go, and the best way to describe that series, it's
12   the only color-changing --
13          THE COURT:  You know how I solved the problem, and
14   I think I did solve it, in the Nike thing was that I
15   required Nike to provide a 30(b)(6) witness.  Now, in that
16   case, he was asked questions about which of his shoes
17   contained XYZ.  That might be a possibility here, too.  Have
18   the witness to come, and you ask him questions about these
19   items, and that way identify the items that could more
20   reasonably be -- more reasonably be asserted to clearly fall
21   within your category.  What do you think of that?
22          MR. MATUSCHAK:  That's -- that's one way of doing
23   it.  Anything, I think, your Honor, is better than sort of
24   kind of blunderbuss approach, which is what I think we have
25   right now.

                              Page 14

27SEPT05.txt

⬚

16

1           THE COURT:  I'd like to see you explore that
2      possibility, and if it doesn't work, then -- then I'll be
3      glad to... .
4           And the other thing is to bear in mind that the
5      payment for the cost of this particular motion could be
6      held in abeyance until -- until we find out how it works.
7           I just decided a case against Wilkie, too, but
8      they moved for me to reconsider.  It was a very interesting
9      tax case.  Have you heard about it?  Your shop is so big
10     you probably haven't.
11          MR. MATUSCHAK:  I haven't, your Honor.  I'm sorry,
12     is it Wilkie or is it --
13          THE COURT:  I mean, Hale and Dorr.
14          MR. MATUSCHAK:  -- Hale and Dorr?  Okay.  Right.
15          THE COURT:  I said Wilkie; I meant Hale and Dorr.
16          This is a case in which the husband of the chief
17     defendant was the head of a pharmaceutical company whose
18     stock values, as we all now know, depended substantially on
19     approval by the FDA.  And he came home one day and told his
20     wife that the FDA had turned him down and that their stock
21     was going to be affected.  And she said, "Oh my god.  I've
22     got to tell my brother so he can sell his stock."
23          And so she told her brother, and he sold his
24     stock; and he told his next door neighbor who was a close
25     friend and he sold his stock.  And the SEC seems to think

⬚

27SEPT05.txt

1   that that's not what you should do.  So they brought suit,
2    and Hale and Dorr -- it isn't Hale and Dorr.
3           THE LAW CLERK:  Wilmer, Cutler, Pickering, Hale
4    and Dorr.
5           THE COURT:  You know, Lloyd Cutler and I were in
6    law school together so I certainly should remember, but it's
7    got so many names now.  That's why I got it mixed up with
8    Wilkie.
9           MR. MATUSCHAK:  Right.
10          THE COURT:  At any rate, Wilmer Cutler moved to
11    dismiss on the grounds that because she had told her husband
12    what she was going to do, she could not be liable under a
13    holding of the Supreme Court, which held that the thrust of
14    10(b)(5) violations in a matter of this kind has to do with
15    dishonesty.  And if you're honest about what you're going to
16    do, you're off the hook.
17          It's not as simple as I'm making it sound, because
18    there was a case that your firm was relying on before the
19    Supreme Court, in which the talk -- the following colloquy
20    took place.  It had to do with a lawyer who represented --
21    who was a member of a firm that represented a seller or a
22    buyer, and the lawyer used the insider information, and he
23    was found liable on the theory that he owed an obligation
24    to his firm to tell them what he was going to do.
25          And in the argument in the case -- and the Supreme

1    Court bought that theory -- one of the justices, and the
                            Page 16

27SEPT05.txt

2      script doesn't seem to indicate who, said to the Justice

3      Department official, "Well, you're telling us it was

4      because he was not straight with his firm.  You mean if he

5      had told them what he was going to do that wouldn't be a

6      violation of the securities laws?"  And the officer in the

7      Justice Department said, "No, it would not be a violation

8      of the securities laws; it might be a violation of

9      fiduciary duties of other kinds, in the state courts, for

10     example, but not our statute."  So that's the case.

11     Interesting.

12            MR. MATUSCHAK:  Sounds like a good argument to me.

13     [Laughter.]

14            THE COURT:  Okay.  Well, why don't you see if you

15     can --

16            MR. MOORE:  There's a second issue.

17            THE COURT:  Oh, there is?

18            MR. MOORE:  Yeah.  This relates to an affirmative

19     defense that TIR has offered that the patents are invalid.

20     They pled it, and they have given us an interrogatory answer

21     in which they claim that the patents are anticipated and

22     obvious.  We'd ask them to state the basis for the

23     affirmative defense.  And the interrogatory answer is

24     essentially that.  It says that the patents are anticipated

25     and obvious.  And then they give us a list of prior art that

☐

19

1      they say is relevant to the patents -- or to the validity of

2      the patents.  And that list includes, for each patent, all

3      references cited during the prosecution of the patents,
                              Page 17

27SEPT05.txt

4    which means that that list, for each patent, is literally
5    hundreds of references that they say make the patent invalid
6    or obvious.

7         And what we're looking for is more details for
8    their defense; we need to understand why it is that they
9    say the patent is invalid so that we can take discovery on
10   that and explore it.  We think that by just giving us this
11   list, they're -- they're -- they're just giving us a
12   haystack and hoping that we search for the needle, and we
13   think to the extent that they have contentions at this
14   point that they should be providing them to us.

15        And the Court may remember TIR came in and -- and
16   their complaint was that they weren't sure which -- which
17   patent claims were being asserted against which products,
18   and the Court asked us to give them a claim chart, which we
19   did, thirty or sixty pages, detailing exactly why we
20   thought the patents weren't infringed.  That was an issue
21   on which we had the burden of proof.  And now we feel that
22   validity, or invalidity, rather, which is an issue for
23   which they bear the burden of proof, they should be
24   required to give us a, you know, corresponding response so
25   that we can focus this case and take discovery on the

                                                              20

1    validity.

2         THE COURT:  Okay.

3         MR. MATUSCHAK:  Two things, your Honor.  I think
4    sort of an initial maybe somewhat, uh, humorous aside, when
5    we asked originally last year for the -- for the
                            Page 18

27SEPT05.txt

 6  infringement contentions to be provided to us, and

 7  invalidity contentions going the other way, these guys

 8  opposed that, and they did not want invalidity contentions.

 9  And now -- now -- and the Court did not order them -- and

10  now that -- now they do.

11          But beyond that, on the -- it is the chicken and

12  the egg issue that you were talking about.  We have

13  identified prior art that we believe renders this patent

14  invalid.  What we're trying to figure out is which prior

15  art is the most relevant.  The reason we can't do that

16  right now is because we've asked them for sort of the most

17  basic information you can ask in a patent case.  When did

18  you make the invention and when did you first reduce it to

19  practice?  Because, obviously, if they made the invention

20  yesterday, the prior art is a lot, you know, of greater

21  scope than if they made it 30 years ago.

22          What they've said is, "Well, when you tell us what

23  you think, you know, your invalidity is, when you show us

24  your prior references, then we'll tell you when we invented

25  it."  And that's going to create a constant back and forth


                                                          21


 1  where each of us is going to be sending, you know, letters

 2  over the transom saying, "Okay.  Now, we've got an earlier

 3  date.  Now you update your contentions to give us a, you

 4  know, an earlier invention date."  Now we go back and do

 5  invalidity contentions again to get beyond that date.  I

 6  mean, that should be something that's pretty much easy for

 7  them to figure out.  We invented the pat -- you know, the
                          Page 19

27SEPT05.txt

8    invention claimed here was invented on or about X date.

9          THE COURT:  What's the date of the patent?

10         MR. MOORE:  Well, the patents all have the

11   application date right on the face of it.  What Mr.

12   Matuschak is talking about is if there's, uh, well, in the

13   U.S. we have the first invent system, so the first person to

14   invent an invention is entitled to the patent regardless of

15   when the application is filed.  In the most -- for the most

16   part, you -- you proceed with the filing date as the date as

17   the cutoff of prior art.  If a prima facie case is made that

18   the patent is invalid, and the inventor maintains that he

19   invented before that, then you can do what we call swear

20   behind it, and you can offer proof of federal intervention.

21         THE COURT:  I understand that.  I'm saying is

22   there any difficulty in stating when this patent was --

23         MR. MOORE:  At this point, we're not --

24         THE COURT:  -- not "this patent" -- when this

25   device was invented?

                                                    22

1          MR. MOORE:  At this point, we're not claiming an

2    earlier date than what's on the patents.

3          THE COURT:  When you say, "at this point," what --

4    what does that signify?

5          MR. MOORE:  We -- we don't -- we haven't

6    established --

7          THE COURT:  Is there any reason to believe that

8    will ever change?

9          MR. MOORE:  It's possible, you know, but we
                              Page 20

27SEPT05.txt

10   haven't established --

11              THE COURT:  Based on what?

12              MR. MOORE:  -- another date at this point.

13              If we were -- if we were to need to, we could go

14   potentially out and try and enter today some of the prior

15   art, but we don't feel that we need to do that at this

16   point.  They've already identified the prior art that they

17   say is relevant and they have already told us the --

18              THE COURT REPORTER:  I'm sorry.

19              MR. MOORE:  -- they've already --

20              THE COURT REPORTER:  You're going to have to slow

21   down, please.

22              MR. MOORE:  They've already identified the prior

23   art and they've already told us that our patents are

24   invalid, but we think we're entitled to know what the basis

25   of that is.

                                                             23

1              THE COURT:  Okay.  Well, let me ponder it and I'll

2   decide it in the next day or so.

3              MR. MATUSCHAK:  If I might, your Honor, we just

4   don't want to shoot at a moving target so that we know what

5   the date -- what the date is that we're shooting at.  We've

6   asked them for that information in both document requests

7   and in interrogatories, and unless we can get this resolved,

8   we'll be back here again on that issue, because they have

9   told us at least today they haven't found any documents --

10   unusual as that may seem -- any documents that would

11   establish when these inventions were made, and any document

27SEPT05.txt

12    that would show how they were actually reduced to a working,

13    uh, thing.  So we asked them in interrogatories the same

14    question, and they have not -- all the inventors still work

15    for their company, but they have not wanted to provide that

16    information to us.  And I think without that, we really --

17    we can give them a chart, but it's not going to be

18    meaningful.  We'll just be supplementing the chart over and

19    over again as they change the dates.

20         MR. MOORE:  Well, the idea that TIR is going to

21    not rely on prior art because we may later be able to swear

22    behind it I don't think is terribly credible.  I mean, if

23    they have an invalidity defense, they're going to make it

24    and then they are going to attack our ability to swear

25    behind that if we decide to do that later on.

⬜

                                                        24

1         THE COURT:  Well, all I can say is I'm glad I'm

2    not a patent lawyer.

3    [Laughter.]

4         Okay.  Thank you. I'll decide that one promptly.

5         MR. MATUSCHAK:  Thank you.

6    [Recess 2:32 p.m.]

7                          -oOo-

8         I certify that the foregoing is a correct

9    transcript from the record of proceedings in the above

10    matter.

11

12       Date:

13

27SEPT05.txt

14
                                    Niles Fowlkes Court Reporter
15
16
17
18
19
20
21
22
23
24
25