**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **COLOR KINETICS INCORPORATED,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:03-cv-12491 (MEL)** |
| **TIR SYSTEMS LTD.** | |
| **Defendant.** | |

**EXPERT REPORT OF CHARLES E. VAN HORN**

I, Charles E. Van Horn, having been retained by Lowrie, Lando & Anastasi, LLP to provide expert testimony on behalf of Color Kinetics Inc. in the above-captioned actions, submit this expert report in this matter.

**QUALIFICATIONS**:

1.      I am an attorney and a partner in the firm of Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.  I presently serve as the head of the Patent Prosecution Section of the firm.  I counsel clients on patent preparation, prosecution and filing strategies, and provide guidance and training to clients and firm attorneys on patent practice and procedures, including those associated with reissue, reexamination and the Patent Cooperation Treaty.  I also serve as a patent practice expert in litigated matters.

2.      I received my Juris Doctorate degree in 1968 from the Washington College of Law, American University.  I received my undergraduate Bachelor of Science

1

Degree in Chemical Engineering from Lehigh University in 1963.  I received a Masters of Business Administration from George Washington University in 1973.  I joined the firm in February 1995 after a 31-year career in the United States Patent and Trademark Office (PTO).

3.      From 1964 to 1973, I worked as a Patent Examiner in the PTO.  During that time, I examined hundreds of patent applications to determine if the inventions were patentable, primarily in the area of electrophotography.

4.      In 1973, I was promoted to the position of Supervisory Patent Examiner.  I supervised 15 to 19 examiners reviewing patent applications related to chemical manufacturing including laminating and tire manufacturing.  Also, during this time, I served for six months as an Examiner-In-Chief on the Patent Office Board of Appeals.

5.      In 1977, I was promoted to the position of Petitions Examiner.  In that capacity, I supervised the disposition of petitions delegated to the Deputy Assistant Commissioner for Patents, including petitions to revive an abandoned application.

6.      In 1979, I was promoted by the PTO to the position of Group Director of Patent Examining Group 120, which reviewed applications in the fields of Organic Chemistry and Biotechnology.  As Group Director, I supervised the activity of up to 135 patent examiners, and directed the implementation of legislative initiatives related to reexamination of patents, patent term extensions, and patent fees.

7.      In 1988, I was promoted to the position of Deputy Solicitor, and in this capacity, rendered legal advice on matters of practice within the PTO on patent related issues.  I also represented the Commissioner of Patents and Trademarks in Federal courts.

8.    In 1990, I was promoted to the position that became known as Deputy Assistant Commissioner for Patent Policy.  As Deputy Assistant Commissioner, I participated in the development and implementation of patent policy relating to the examination of patent applications, and the development of regulations to govern patent prosecution practice.  Among the activities I participated in during this period of time was the development of new regulations governing duty of disclosure before the PTO in patent matters.

9.    Among the most significant awards that I have received during my career are the Jefferson Medal and the Department of Commerce Gold Medal.  A more complete description of my education, background and qualifications can be found in my Curriculum Vitae, attached hereto as **Exhibit A**.

**PUBLICATIONS**:

10.    I have, within the past ten years, authored or co-authored numerous publications relating to patent law and patent policy.  A complete list of these publications is attached hereto as **Exhibit B**.

**PREVIOUS TESTIMONY**:

11.    I have testified as a witness at trial or by deposition in 11 cases, which are identified in **Exhibit C** attached hereto.

**ARRANGEMENT**:

12.    I have been asked by counsel for Color Kinetics Inc. to provide expert opinions in this action.  Under my arrangement with Lowrie, Lando & Anastasi, LLP, I am to be compensated at my usual and customary rate of $580 per hour.  In addition to this hourly compensation, I am to be furnished with, or reimbursed for, my expenses.

3

No part of my compensation is contingent upon the outcome of this case or any issue in it.

**INFORMATION CONSIDERED**:

13.    As of the date of this report, I have reviewed the documents and considered the information listed in **Exhibit D** in preparation of the opinions expressed herein.  I also have relied on experience and information I have obtained in my over 40 years of being associated with the PTO and as an attorney.

**PATENT PRACTICE AND PROCEDURES**:

14.    The PTO is an agency within the United States Department of Commerce. Its principal responsibility with respect to its patent operation is to examine patent applications to determine whether they should issue as patents.  The governing statutory provisions are set forth in Title 35 of the United States Code.  The codified rules of practice are set forth in Title 37 of the Code of Federal Regulations.  The Manual of Patent Examining Procedure ("MPEP") sets forth additional guidelines and instructions for the examination and processing of patent applications.

15.    Before a patent application may issue as a United States patent, it is expected to undergo a thorough examination by a PTO examiner to ensure that the application and the claimed subject matter meet all of the statutory requirements for patentability.  The processing of an application in the PTO is illustrated in **Exhibit E**. The patenting process can be broken down into three distinct segments:  (1) a pre-examination processing of the patent application; (2) the examination process; and (3) the post-examination processing of the patent application.  The pre- and post-examination processing of a patent application involve essentially administrative

4

processing of the application, whereas the actual determination of whether a patent should be issued is determined in the examination process.  At the beginning of the examination process, each application is assigned to a patent examiner who has been trained in making patentability determinations.  In general, the PTO assigns an examiner to a particular area of technology so that the examiner becomes familiar with the technology and can provide both an effective and efficient determination of patentability.  Generally speaking, a patent examiner has an undergraduate degree (a limited number have an advanced degree) in some field of science or technology, and may have actual experience working in the field.  Some examiners also are lawyers.

16.     A typical patent application contains three parts.  First, a written description of the invention that explains what the invention is, how it is made, how it is used, and the best mode for practicing the invention.  This part of the application is sometimes called the "specification."  The specification concludes with one or more claims.  A claim is a single sentence comprising a combination of words and phrases (also known as elements or limitations) that make up the claim.  A claim may be either independent (complete in itself) or dependent (including elements or limitations contained in more than one claim).  A second part of the application is contained in drawings that may facilitate an understanding of the invention described in the specification.  A third part is an oath or declaration by the inventor(s) in accordance with 35 U.S.C. § 115 and 37 C.F.R. § 1.63.

17.     The function of a claim is to point out what the applicants regard as their invention in such a way as to distinguish it from what was previously known.  When a patent is issued, the claims set forth the legal boundaries of protection conveyed by the

patent grant.  During the course of examination of a patent application, the claims in the application may be changed to more clearly define what the applicants regard as their invention and to define subject matter that is not contained in the prior art.  Prior art is a term that is conventionally used to define the totality of information or evidence that could be used to establish that the subject matter of a claim is not novel or is obvious.  Patent applications and patents typically have a number of claims of varying scope to provide varying degrees of protection.

18.    In the examination process, the patent examiner is expected to make a thorough study of the patent application and is expected to conduct a thorough investigation of the available prior art relating to the subject matter of the claimed invention.  In conducting the investigation of the prior art, the examiner relies on search tools that include a search file of U.S. patents, some foreign patent documents, and some published literature arranged according to the U.S. Patent Classification System.  The examiner also has available a technical library that has access to commercial databases.  Selected technical publications and magazines also are routinely circulated among examiners working in the particular field to which the publication relates.  The examiner is expected to record the classes and subclasses searched, publications and databases searched, the date the search was made or was brought up to date and the examiner's initials.  MPEP 717.05.  Although the examiner is expected to consider each document in each subclass searched, unless otherwise indicated, the examiner cites only the best prior art.  MPEP 904.02.

19.    A patent examiner is expected to make a detailed examination both with respect to compliance of the application with applicable statutes and regulations and

6

with respect to the patentability of each of the claims presented in the application. Only those applications and claims that are determined to meet all the statutory requirements for obtaining a patent are expected to be issued as U.S. patents. Each patent and each claim in the patent is entitled to a statutory presumption of validity, which can be overcome by clear and convincing evidence.

20.    When first considering an application for examination, and after considering the application including the claims, an examiner may consider making a restriction requirement where multiple inventions are claimed. A purpose of such a requirement is to limit the resources that are necessary to examine the application, and possibly to have the application reassigned where the applicant elects an invention that is not classified in a technical area examined by the original examiner.

21.    The examination of a patent application in the PTO typically entails a multi-stage process. After considering the application and conducting a search for relevant prior art, the examiner issues an Office action that describes the results of the examination of the patent application. Where the examiner questions whether one or more of the statutory requirements for patentability are satisfied, the examiner typically formulates a rejection of one or more claims that identifies the statutory basis for the rejection, the evidence that is relied upon by the examiner to support the conclusion of unpatentability, and a commentary explaining the reasons for the rejection. The applicant is given a period of time to reply to that Office action and, if a patent is pursued, may respond by simply arguing that the examiner's rejection is in error, may provide evidence to support those arguments, and may amend the claims to better point out what applicants regard as their invention or to avoid prior art. Interviews between

7

an examiner and a representative of the applicant are permitted and typically take place either in person at the PTO or by telephone. A written summary of the interview is expected to be placed in the PTO file.

22. The PTO policy is to make the second action final. An applicant may respond to a final action, but no longer has a right to submit any new claims or new evidence for consideration by the examiner. An applicant dissatisfied with the final decision of the examiner may appeal that decision to a PTO panel of administrative patent judges at the Board of Patent Appeals and Interferences, or may decide to file a continuing application to continue seeking patent protection for subject matter disclosed in the application.

23. The exchanges between an applicant and the patent examiner constitute what is called "patent prosecution". The patent prosecution papers and the application papers are maintained in the PTO in a folder called a "file wrapper". This folder and its contents, sometimes referenced as a "file history" or "prosecution history," constitute the official record of a patent in the PTO. The prosecution history can be an important instrument in determining the meanings of words in the patent and the scope of the claims in the patent. The text of an issued patent is the same as that of the application as filed, subject to any amendments that may have been made during prosecution.

24. During the examination process, a patent examiner is expected to determine whether the application and the claimed invention comply with the legal requirements for a patent. The patent examiner is expected to determine whether the specification of a patent application contains a written description of the invention and of a manner and process of making and using it, in such full, clear, concise, and exact

8

terms as to enable any person skilled in the art to which the invention pertains to make and use the claimed invention over the full scope of each claim.  Where appropriate information comes to the attention of the PTO, the patent examiner also reviews the application to determine whether the best mode contemplated by the inventor of carrying out the invention is disclosed.  These requirements for the specification are typically referred to as (1) the "written description" requirement, (2) the "enablement" requirement, and (3) the "best mode" requirement.  In conducting the examination of a patent application, an examiner is expected to consider:  (1) that the test for the written description requirement is whether the disclosure of the application reasonably conveys to one skilled in the art that the inventor had possession of the claimed subject matter at the time the application is filed - i.e., the inventor had made the invention with the described features at the time the application was filed; (2) that the test for the enablement requirement is whether the specification, viewed from the perspective of a person skilled in the art, teaches such a person how to make and use the claimed invention over the full scope of each claim, without having to resort to undue experimentation; and (3) the best mode requirement is to be analyzed by determining, first, whether the inventor in fact contemplated a best mode for carrying out his invention at the time the application was filed (a subjective test) and, secondly, whether the specification discloses the contemplated best mode (an objective test).

25.     One aspect of the written description requirement is that an applicant is prohibited from introducing new matter into the application that was not disclosed in the application as originally filed.  The prohibition against new matter does not prevent an applicant from amending the application to add or use terms or phrases different than

9

those present in the patent application as filed, but the terms and phrases that are added or used must be supported in the original application either explicitly, implicitly or inherently.  An examiner is expected to review any amendment made to a patent application to determine whether the amendment introduces new matter into the disclosure of the invention.  If new matter is introduced, the examiner is expected to object to the introduction of new matter and require its cancellation.

26.    A patent examiner is expected to determine whether each of the claims in the patent application particularly points out and distinctly claims the subject matter which the applicants regard as their invention.  In doing so, an examiner is expected to consider whether the claim sets out and circumscribes a particular area with a reasonable degree of particularity, and that the language employed in the claim must be analyzed in light of the teachings of the prior art and of the disclosure in the application as it would be interpreted by a person possessing the ordinary level of skill in the pertinent art.  In addition, a patent examiner is expected to determine whether the subject matter of a claim meets the statutory criteria for patentability including utility, novelty, and nonobviousness.

27.    A patent examiner is expected to determine whether a claim is directed to subject matter which is new relative to the prior art.  In doing so, an examiner is expected to recognize that a claim is not directed to new subject matter if a single item of prior art describes each element of the claimed invention in the claimed relationship.

28.    A patent examiner is expected to determine whether the subject matter, although novel, meets the standard of nonobviousness.  In making this determination, the examiner is expected to consider the scope and content of the prior art, the

10

differences between the claimed invention and the prior art, the level of skill in the art, and any evidence of so-called secondary considerations such as unexpected results, commercial success, or whether the invention fills a long felt need.  Given this factual background, the examiner is expected to determine whether the claimed invention as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made.

29.    An Examiner is expected to determine whether a claim should be rejected for double patenting.  Double patenting is a doctrine that prohibits an inventor or an assignee from obtaining two or more patents on the same invention, or on inventions that are not patentably distinct from each other.  Two patents should not issue on the identical invention, but two or more patents can issue to the same inventor or assignee where the claimed inventions are not identical, but still not patentably distinct if a terminal disclaimer under 37 C.F.R. § 1.321 is filed that would prohibit any unjustified extension of the term of the patent rights to exclude others or permit the separate patents to be owned by different assignees.  A claimed invention in one patent would be considered to be patentably distinct from the claimed invention in a second patent if it was directed to an invention that was both different and unobvious from the claimed invention in the second patent.

30.    In addition to an original patent application, subsequent related applications of different kinds may be filed to obtain the full scope of protection for the inventions disclosed in an original application.  A continuing application is an application based wholly or in part on an earlier filed application.  The continuing application may be a continuation, division, or continuation-in-part (CIP) of the earlier-filed application.

11

One type of related application is called a continuation application that is directed to the same subject matter and claims the same invention as that described and claimed in the earlier or parent application. The characteristics of a continuation application are described in MPEP 201.07, 7th Ed. (July 1998). As the name implies, a continuation application is used to continue the examination process that started in the parent application. It is for the same invention claimed in the parent and filed before the parent becomes abandoned or patented. Some of the principal uses of a continuation application are to present additional amendments or evidence of patentability for consideration by the PTO, to obtain claims of typically broader scope than the examiner considered patentable in the parent application, and to obtain PTO consideration of prior art or other information that may be material to patentability before a patent is granted.

31.    A division or divisional application is a later application for an invention that is distinct from an invention claimed in an earlier application disclosing and claiming only subject matter disclosed in the earlier or parent application, and filed before the earlier application becomes abandoned or patented. The characteristics of a divisional application are described in MPEP 201.06, 7th Ed. (July 1998). A continuation-in-part application (CIP) is an application filed during the pendency of an earlier application, repeating some substantial portion or all of the subject matter in an earlier application, adding subject matter not disclosed in the earlier application, and filed before the earlier application becomes abandoned or patented. The characteristics of a CIP are described in MPEP 201.08, 7th Ed. (July 1998).

12

32.    Each claim in a continuing application has an effective filing date.  The effective filing date is the filing date of the earliest application which supports the subject matter of the claim in the manner required by 35 U.S.C. § 112, first paragraph.  Different claims in a continuing application may have different effective filing dates for the purpose of defining the prior art available for a determination of patentability of a claim. A claim in a continuing application is not entitled to the filing date of an earlier application unless four conditions are satisfied:  (1) the continuing application is filed during the pendency of an earlier application; (2) the applications have at least one inventor in common; (3) the continuing application contains a reference to the earlier application; and (4) the claim is supported in the manner required by 35 U.S.C. § 112, first paragraph, in the earlier application.

## DUTY OF CANDOR AND GOOD FAITH TO PTO:

### A.    General Background

33.    Individuals who are substantively involved with the preparation and prosecution of a patent application before the PTO have a duty of candor and good faith in the conduct of proceedings before the PTO.  In the case of corporations or institutions as such, only those individuals who are substantively involved in preparing or prosecuting the application have a duty.  Individuals who have this duty include the inventors named in the patent application, each attorney or agent who prepares or prosecutes the application before the PTO, and every other person who is substantively involved in the preparation or prosecution of the patent application.  The duty of candor and good faith includes, but is not limited to, the duty to disclose known material prior art, whether found by search or known through other means by anyone who has a duty

toward the PTO.  There is no obligation to disclose information that is either not material

or is cumulative to information already before the examiner.  Nor is there an obligation

for any individual to conduct a search of available information that might have some

relevance to the patentability of a claim.  The duty of candor and good faith also

includes a duty to refrain from intentionally making untrue or otherwise misleading

representations.

## B.    Information Disclosure Statement (IDS)

34.    The PTO has established procedures to bring information to the attention

of the PTO that may be relevant to its determination of patentability.  Information

concerning the state of the prior art known to those participating in the preparation or

prosecution of a patent application could be communicated to the PTO in the

specification of the patent application or brought to the attention of the PTO in the form

of an information disclosure statement.  The regulations pertaining to the submission of

an information disclosure statement provide guidance on the form, content, and

procedural requirements that will ensure consideration of cited information by the PTO.

Patent examiners are expected to consider information cited to the PTO in compliance

with the IDS requirements.  The IDS requirements are designed to encourage early and

prompt submission of relevant prior art to promote compact prosecution and early

recognition of significant patentability issues, particularly relating to the prior art.  The

PTO has set forth the minimum requirements for information to be considered in 37

C.F.R. §§ 1.97 and 1.98.  Multiple information disclosure statements may be filed in a

single application, and they will be considered, provided each is in compliance with the

appropriate requirements.  MPEP 609, 7th Ed. (July 1998).  The examiner is expected to

14

consider information which has been considered by the PTO in a parent application when examining (A) a continuation application, (B) a divisional application, or (C) a continuation-in-part application. *Id.*

**OPINIONS**:

35.    In addition to providing background information on patents and the processing of patent applications in the PTO, I have been asked to consider and summarize the prosecution histories of patent applications leading to the grant of U.S. Patent Nos. 6,016,038 (the '038 patent), 6,150,774 (the '774 patent), 6,211,626 (the '626 patent), 6,340,868 (the '868 patent), 6,788,011 (the '011 patent), and 6,806,659 (the '659 patent), and to address the allegations of inequitable conduct made by TIR Systems Ltd. in this case.  In the description below, I have adopted the conventional practice of referring to a patent application by the last three digits of the serial number, and to a patent by the last three digits of the patent number.  In addition, the date associated with any paper filed in the PTO is the date the PTO uses as the date of receipt of that paper.

36.    U.S. Patent No. 6,788,011 was granted September 7, 2004, based on Application No. 09/971,367, filed October 4, 2001.  The '367 Application was a continuation of Application No. 09/669,121, filed September 25, 2000, granted as U.S. Patent No. 6,806,659 on October 19, 2004.  The '121 application was a continuation of Application No. 09/425,770 filed October 22, 1999, granted as U.S. Patent No. 6,150,774 on November 21, 2000.  The '770 application was a continuation of Application No. 08/920,156 filed August 26, 1997, granted as U.S. Patent 6,016,038 on

15

January 18, 2000.  The relationships of these applications; and patents are illustrated in **<u>Exhibit F</u>**.

37.    U.S. Patent No. 6,340,868 was granted on January 22, 2002, based on Application No. 09/626,905, filed July 27, 2000.  The '905 application was a continuation of Application No. 09/213,659, filed December 17, 1998, granted as U.S. Patent No. 6,211,626 on April 3, 2001.  The '659 Application was a continuation-in-part of Application No. 08/920,156, filed August 26, 1997, and claimed the benefit of 5 provisional applications: 60/071,281 filed December 17, 1997; 60/068,792 filed December 24, 1997; 60/078,861 filed March 20, 1998; 60/079,285 filed March 25, 1998; and 60/090,920 filed June 26, 1998.  The relationships of these applications also are illustrated in **<u>Exhibit F</u>**.

38.    All patents were assigned at the time of grant to Color Kinetics, Inc. of Boston, Massachusetts.  The prosecution histories of the patent applications that resulted in the grant of these different sequences of patents will be discussed in the order of filing.

### A.  U.S. Patent No. 6,016,038

39.    Application No. 08/920,156 was filed on August 26, 1997 for an invention entitled "Multicolored LED Lighting Method and Apparatus."  George G. Mueller and Ihor A. Lys were named as the inventors.  Applicants established small entity status as independent inventors.  CKI 00073-74.  An IDS was filed on November18, 1998, CKI 00075-86.

40.    A first PTO action (i.e., communication between the patent examiner and applicants' representative) was mailed October 28, 1998.  CKI 00087-97.  Several

claims were indicated as being allowable and several claims were rejected under 35 U.S.C. § 112, second paragraph as lacking clarity, or as being unpatentable over prior art patents to Phares (U.S. Patent No. 5,420,482) or Hamamoto et al. (U.S. Patent No. 5,350,977). A preliminary amendment had been filed on September 11, 1998, adding claims 36-43, but apparently was not matched with the file until after the first action was mailed because the new claims were not addressed in the first action. CKI 00105-107. A revocation and new power of attorney were filed January 11, 1999. CKI 00115.

41.    A reply to the first PTO action was filed on January 19, 1999, in which all claims were amended to place them in independent form or to address recitations that the examiner identified as lacking clarity. CKI 00120-128. An interview summary indicates that it was agreed to cancel claims 36-43 during a personal interview with the examiner on March 8, 1999. CKI 00129.

42.    A second PTO action was mailed May 12, 1999, in which objections were made against the drawings, claims 5-14 were rejected on lacking clarity, and claims 24, 25, 27, 33 and 34 were rejected as being unpatentable over the prior art as described in Hamamoto or Sugden (U.S. Patent No. 5,406,176). CKI 00130-139. The examiner provided a statement of reasons for allowance. CKI 00137.

43.    A reply to the second PTO action was filed on June 7, 1999, in which all claims rejected over prior art were cancelled without prejudice, and amending other claims to place them in independent form or to address the rejection based on lack of clarity. CKI 00140-151. An interview summary indicates that all claims were indicated to be allowable (i.e., patentable) in a personal interview conducted on June 8, 1999.

CKI 00152.  A supplemental amendment was filed June 24, 1999, in which additional amendments were made to the drawings, specification and claims.  CKI 00153-160.

44.     Notices of Allowability and Allowance were mailed on July 1, 1999, indicating that claims 2-21, 28-31 and 35 were allowed and further providing an examiner's statement of reasons for allowance.  CKI 00161-167.  A continued prosecution application (CPA) and an IDS were filed on July 27, 1999.  CKI 00169-00173.  A CPA was a procedural tool then available so that new information (e.g., supplied in an IDS) could be considered by the examiner before a patent was granted.  The CPA procedure is no longer available in utility patent applications.  37 C.F.R. § 1.53(d)(1) (September 2004).  Notices of Allowability and allowance were again mailed on August 18, 1999, indicating that the information cited in the IDS had been considered and that all pending claims were allowable.  CKI 00174-178.  Upon timely payment of the issue fee, the '156 application was granted as U.S. Patent No. 6,016,038 on January 18, 2000.  It is further noted from the Search Notes in the file wrapper that Haissan Philogene was consulted during the examination process in this application.  CKI 00193.

### B.  U.S. Patent No. 6,159,774

45.     Application No. 09/425,770 was filed on October 22, 1999 for an invention entitled "Multicolored LED Lighting Method and Apparatus."  George G. Mueller and Ihor A. Lys were named as the inventors.  This application was a continuation of Application No. 08/920,156.  This continuing data was verified by Examiner Haissan Philogene on the face of the file wrapper.  CKI 00208.  A preliminary amendment cancelled claims 2,

3, 5-21, 28-31 and 35.  CKI 00212.  An IDS was filed on March 17, 2000.  CKI 00267-270.

46.    A first PTO action was mailed April 6, 2000, in which claims 22, 25, 32 and 33 were considered allowable, and claims 1, 4, 23, 24, 26, 27 and 34 were rejected under the judicially created doctrine of double patenting over claims 1, 3, 21 and 25 of the '038 patent.  CKI 00271-277.  It is clear that the examiner used Form Paragraph 8.38 (MPEP 804, 7th Ed. (July 1998)) to state this rejection.  An IDS was filed March 31, 2000, CKI 00278-282.

47.    A reply to the first action was filed May 25, 2000, in which on abstract was provided along with a terminal disclaimer to obviate the double patenting rejection.  CKI 00284-288.  Notices of Allowability and Allowance were mailed on June 16, 2000, indicating that all pending claims (i.e., claims 1, 4, 22-27 and 32-34) were allowable and providing a statement of reasons for allowance.  CKI 00289-293.  An amendment under 37 C.F.R. § 312 (i.e., an amendment filed after a Notice of Allowance was mailed) was filed August 15, 2000, in which amendments to the drawings, specification, and claims were proposed.  CKI 00294-302.  The PTO entered these amendments according to the decision mailed September 29, 2000.  CKI 00304-305.  Upon timely payment of the issue fee, the '770 application was granted as U.S. Patent No. 6,150,774 on November 21, 2000.

48.    As TIR's allegations of inequitable conduct focus only on the prosecution of the '038 and '774 patents, the prosecution histories of the other patents discussed in this report will be discussed in summary fashion only.

19

## C.  U.S. Patent No. 6,806,659

49.     Application No. 09/669,121 was filed on September 25, 2000, for an invention entitled "Multicolored LED Lighting Method and Apparatus."  This application also identified George G. Mueller and Ihor A. Lys as the inventors.  This application was identified as a continuation of the application granted as the '774 patent, which was a continuation of the application granted as the '038 patent.  All original claims were cancelled and new claims 36-62 were presented for examination by preliminary amendment filed January 19, 2001.  The application was prosecuted for more than 4 years until it was granted as the '659 patent on October 19, 2004.

50.     During the course of prosecution, the PTO issued 5 actions, applicants filed 19 information disclosure statements, and applicants filed 3 Requests for Continued Examination (RCE) in order to have additional information considered before a patent was granted on the application.  The RCE practice was authorized under 35 U.S.C. § 132(b), and has replaced the CPA practice in utility applications as a procedural tool to reopen prosecution after the close of prosecution in an application.  The '659 patent was granted with 20 claims.

## D.  U.S. Patent No. 6,788,011

51.     Application No. 09/971,367 was filed on October 4, 2001, for an invention entitled "Multicolored LED Lighting Method and Apparatus."  This application also identified George G. Mueller and Ihor A. Lys as the inventors.  This application was identified as a continuation of the application granted as the '659 patent, which was a continuation of the application granted as the '774 patent, which was a continuation of

the application granted as the '038 patent.  This application was prosecuted for almost three years until it was granted as the '011 patent on September 7, 2004.

52.    During the course of prosecution, applicants filed 13 information disclosure statements and 2 RCEs in order to have additional information considered before a patent was granted on this application.  The '011 patent was granted with 144 claims.

### E.  U.S. Patent No. 6,211,626

53.    Application No. 09/213,659 was filed on December 17, 1998, for an invention entitled "Illumination Components."  The application identified Ihor A. Lys, George G. Mueller, Frederick Morgan and Michael K. Blackwell as the inventors.  The application was a continuation-in-part (CIP) of the application granted as the '038 patent, and claimed the benefit of 5 provisional applications.  The original claims were directed to a modular LED unit (claims 1-28), a method for illumination (claims 29-79), and a light module (claims 80-81).  An IDS was filed October 4, 1999.

54.    A first PTO action was mailed April 26, 2000, in which claims 80 and 81 were indicated to be allowable, and claims 1-79 were rejected as being anticipated by Chliwnyj et al. (U.S. Patent No. 5,924,784).  A timely reply to the first action was filed July 31, 2000, in which claims 1-79 were cancelled without prejudice, and claims 82-87 (dependent on allowed claim 80) were added.  Notices of Allowability and Allowance were mailed August 22, 2000 indicating that claims 80-87 were allowed and providing a statement of the reasons for allowance.  Upon timely payment of the issue fee, the '659 application was granted as the '626 patent on April 3, 2001.  The examination of this

application was conducted by Assistant Examiner Tran D. Chuc and Supervisory

Examiner Don Wong.

### F.  U.S. Patent No. 6,340,868

55.    Application No. 09/626,905 was filed July 27, 2000, for an invention

entitled "Illumination Components."  This application identified the same inventors as in

the parent application, and was a continuation of the application granted as the '626

patent, which was in turn a CIP of the application granted as the '038 patent and also

claimed the benefit of 5 provisional applications.  A preliminary amendment was filed

July 27, 2000, in which some claims were cancelled, other claims amended, and

arguments presented directed to the rejections made by the PTO in the parent

application.  CKI 00723-738, An IDS was filed October 19, 2000.  CKI 00739-743.

56.    A first PTO action was mailed January 19, 2001, in which claims 29-79

were rejected a lacking clarity and claims 6-28 were rejected as being unpatentable

over the teachings of Chliwnyj et al. (U.S. Patent No. 5,924,784) in view of Allen (U.S.

Patent No. 6,072,280).  According to an interview summary, agreement was reached at

a personal interview conducted with Assistant Examiner Tran D. Chuc and his

supervisor Don Wong on April 18, 2001, to amend the claims to distinguish the claimed

invention over the prior art.  CKI 00751.

57.    A reply to the first action and an IDS were filed on May 21, 2001.  CKI

00754-764.  The reply cancelled all pending claims and added new claims 80-89, which

was argued to patentability distinguish over the prior art applied in the previous PTO

action.  Notices of Allowability and Allowance were mailed on July 31, 2001, and

included an examiner's statement of reasons for allowance.  CKI 00765-770.

Applicants filed comments on the statement of reasons for allowance on September 10,

2001.  Upon timely payment of the issue fee, the '905 application was granted as the

'868 patent on January 22, 2002.

### Allegation of Inequitable Conduct

58.    I understand that Color Kinectics, Inc. is being accused of inequitable

conduct based on the alleged failure to disclose to the PTO in the '774 patent

prosecution the fact that identical claims had been rejected in the parent application that

was granted as the '038 patent.  For the reasons described below, the record I have

reviewed cannot possibly support such a conclusion because I consider such

information to be cumulative to information already before the examiner and there is no

evidence, much less clear and convincing evidence, of an intent to deceive.

59.    It is common practice in the PTO for examiners to review the prosecution

history and the documents cited therein in one or more parent applications while

examining a continuation application.  The application that matured into the '774 patent

clearly identified it as a continuation of the parent application (08/920,156) that was

granted as the '038 patent.  In addition, Examiner Philogene acknowledged the claims

for benefit of the parent application by placing her initials on the face of the file wrapper.

CKI 00208.  The '774 patent file history also establishes that Examiner Philogene was

aware of the parent application and patent and the claims to patentably indistinct

subject matter from the claims in the '038 patent when she issued the double patenting

rejection over the claims in the '038 patent.  CKI 00273-74.

60.    As the name implies, a continuation application is typically filed for the

purpose of continuing prosecution of claims directed to the  same invention disclosed

and claimed in the parent application.  The prosecution history of one or more parent applications may be important to the examination of claims in a continuation application for a variety of reasons.  In my experience, as a patent examiner, as a supervisor of patent examiners and through the remainder of my career at the PTO, consulting and reviewing the parent applications of a continuation application was and is a routine and conventional practice in the process of examining a continuation application.  Because the information would already be before the examiner, I do not consider that there is any duty on the part of any individual to disclose the content of a prior parent application to the examiner in a continuation application, unless requested to do so by the examiner. There is no duty to disclose information contained in a parent application that is identified in accordance with 35 U.S.C. § 120 and 37 C.F.R. § 1.78 in a continuation application because that information is presumed to be before the examiner when examining a continuation application.  Since the citation of information contained in any Office Action or constituting a part of the prosecution history of a parent application would be cumulative to information already before the examiner, there is no duty on the part of any individual to cite the information.

61.    The PTO publishes guidance to examiners for conducting a search and examination of continuing applications.  In MPEP 609, 7th Ed. (July 1998), examiners are instructed to consider information that was considered in a parent application when examining a continuation or CIP application.  In MPEP 707.05 (7th Ed. (July 1998), examiners were directed as follows:

> In all continuation and continuation-in-part applications, the parent applications should be reviewed for <u>pertinent</u> prior art.  [emphasis

supplied].

Certainly one indicia of prior art that is "pertinent" is whether and how the prior art was applied in the rejection of claims to the same invention (i.e., claims in a continuation application) in the parent application of a continuation or CIP.

62.    Although an examiner in a continuation application is not bound by the actions and/or decisions of a different examiner in the parent application, an examiner is expected to give full faith and credit to the search and actions of a previous examiner on the same subject matter.  MPEP 706.04, 7th Ed. (July 1998).  One cannot give full faith and credit to the work of a previous examiner unless one has at least considered the actions of the previous examiner in the prosecution history of the parent application.  Assuming the rejection of claims in a parent application would be important to a reasonable examiner when examining a continuation application containing the same or similar claims, it is ironic, unfair, and simply wrong to assume that the examiner would not review the parent application for that very information when examining a continuation application.

63.    TIR Systems Ltd. has pointed to the statement of the double patenting rejection in the '774 prosecution history as a basis for concluding that Examiner Philogene had no idea that the same claims had previously been rejected in the '038 application.  Defendant TIR's Opposition to CKI's Motion For Summary Judgment of No Inequitable Conduct, p. 4.  I do not agree that this is the only conclusion or even the most likely conclusion that should be drawn from this statement.  As noted above in paragraph 46, Examiner Philogene did what most examiners do in such situations, she used a form paragraph to make the statement of the double patenting rejection.

Accordingly, the statement should be viewed in the context of using a standard form paragraph to state a rejection, rather than as evidence of what the examiner did or did not consider in the parent application.

64.    The PTO has published non-binding guidance for attorneys, agents and other individuals on possible procedures that could help avoid problems under the duty of disclosure.  See MPEP 2004, at least as far back as the 5th Ed., Rev. 3 (May 1986).  Although I note that item #9 in Section 2004 cautions individuals not to rely upon the examiner of a particular application to be aware of other applications belonging to the same applicant or assignee, this would not apply (at least I have never understood it to apply) to applications that are specifically referenced in the first paragraph of the specification pursuant to 35 U.S.C. § 120 and 35 C.F.R. § 1.78.  This is because the examiner is already aware of applications in the chain of benefit application(s) because of the reference in the first paragraph.  Further, as noted above, the face of the application file contains the initials of Examiner Philogene as verifying the accuracy of the continuing application data.  An Examiner "must review the data regarding prior U.S. applications to make sure that the information is correct when preparing the application for issue."  MPEP 1302.09, 7th Ed. (July 1998).

65.    As a PTO employee, I was involved with the drafting of the revisions to 37 C.F.R. §§ 1.56, 1.97 and 1.98, and the associated MPEP guidance in section 609 and chapter 2000 in 1992.  It did not occur to me then, or even now, that applicants could have a duty to separately inform an examiner in a continuation application of actions taken by a different examiner in a parent application.  For the reasons noted above, it has always been my practice and understanding that such information (i.e., prosecution

26

history in a parent application) was before the examiner in a continuation application. To separately provide the prosecution history of a parent application to the examiner in a continuation application would subject both applicants and the PTO to a senseless and needless duplication of paperwork.

66.    In my experience, both within the PTO and in private practice, it is accepted practice in compliance with the letter and spirit of the rules and principles of the duty of candor and good faith, which includes the duty to disclose material information to the PTO, to rely on examiners to consider the prosecution history of any parent application when prosecuting a continuation application.  As noted above, continuation application practice is very common in the PTO.  According to a recent notice of proposed rulemaking addressing continuation application practice,[1] the number of continuation and CIP applications filed in fiscal year 2005 was about 44,500 out of a total of approximately 317,000 applications filed that year.

67.    As further confirmation of the conventional and accepted practice of relying on the PTO to consider the prosecution history of a parent application when prosecuting a continuation application, it can be shown that this is the practice followed by the law firms of Hale and Dorr LLP and its successor Wilmer Cutler Pickering Hale and Dorr LLP.  The following example illustrates that the practitioners prosecuting continuation applications took no steps to inform the PTO in a continuation application of any rejection over prior art of the same or similar claims in a parent application.

---

1   Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Continuing Patentably Indistinct Claims, 71 Fed. Reg. 48(January 3, 2006).

68.    The applications granted as U. S. Patent Nos. 7,004,169 and 6,631,720 are related as continuation and parent respectively, with an intermediate abandoned continuation Application No. 10/684,048.  These applications were prosecuted by attorneys at Hale and Dorr LLP or its successor firm.  Focusing on claim 1, for example, as presented in each of the applications as filed, these prosecution histories show that claim 1 in the first application was rejected as being anticipated by Brain (U. S. Patent No. 5,241,956) in a PTO action mailed March 28, 2001.  A substantially similar, and patentably indistinct (according to the PTO), claim was presented in each of the continuation applications that eventually led to the '169 patent, but the practitioners prosecuting these continuation applications never informed the examiner in either continuation application that a similar, patentably indistinct claim had been rejected in the first parent application that led to the '720 patent.  Even though such a rejection may have been important to a reasonable examiner is deciding whether to allow a similar, patentably indistinct claim in the continuation applications, there is no separate duty on the practitioner to bring that rejection to the attention of the examiner because it is already before the examiner and would normally be considered in examining the continuation application.

69.    To the extent that any expert for Defendant offers prior to or at trial an opinion in my area of competence with which I disagree or upon which I have an opinion, I expect that I may comment on that opinion.  In the event of subsequent developments, including the availability of additional evidence, that may have a bearing on my opinions, I expect that I may supplement this report to take those developments into consideration or otherwise consider the purpose of testifying at trial.

70.     I may use any exhibit cited herein and any documents cited under Exhibit D of this report to support or summarize the opinions set forth herein.  I may also use other demonstrative exhibits, summaries, or the exhibits that are not yet prepared to further illustrate my opinions.  I understand that prior to trial, such exhibits would be exchanged with Defendant at a time to be mutually agreed upon.

_____

Charles E. Van Horn

Date:_____