# EXHIBIT 2

1                              1

2

3                    IMPORTANT NOTICE
         PLEASE READ BEFORE USING REALTIME ROUGH DRAFT

4
                    AGREEMENT OF PARTIES
5            WORKING WITH REALTIME ROUGH DRAFTS

6   We, the parties working with realtime and rough draft
    transcripts, understand that if we choose to use the
7    realtime rough draft screen, or the printout, that we are
    doing so with the understanding that the rough draft is
8    an uncertified copy.

9    We further agree not to share, give, copy, scan, fax, or
    in any way distribute this realtime rough draft in any
10    form (written or computerized) to any party.
    However, our own experts, co-counsel, and staff, may have
11    limited internal use of same with the understanding that
    we agree to destroy our realtime rough draft and/or any
12    computerized form, if any, and replace it with the final
    transcript upon its completion.
13
    Case:  CK Incorporated v TIR
14    Witness:  LISA DOLAK
    Date:  November 1, 2006
15
    REPORTER'S NOTE:
16
    Since this deposition has been realtimed and is in rough
17    draft form, please be aware that there may be a
    discrepancy regarding page and line number when comparing
18    the realtime screen, the rough draft, rough draft disk,
    and the final transcript.
19
    Also please be aware that the realtime screen and the
20    uncertified rough draft transcript may contain
    untranslated steno, reporter's note in parentheses or an
21    indication to check misspelled proper names, incorrect or
    missing Q/A symbols or punctuation, and/or nonsensical
22    English word combinations.  All such entries will be
    corrected on the final certified transcript.
23
    PAMELA PALOMEQUE, RPR
24    Reporter

25   ACTION REPORTING SERVICE
    (315) 428-9311

2    would say maybe 45 percent, 40 to 45 percent.

3        Q.   And what percent was doing opinion work?

4        A.   Opinion work was probably less than 5 percent

5    of my work.

6        Q.   How many patents would you say you prosecuted

7    during your time at Nixon Hargrave?

8            MR. WALDEN:  Objection, vague.

9        A.   By prosecuted do you mean drafted?  Do you

10   mean participated in?

11       Q.   How many did you participate in?

12       A.   I don't have exact numbers on anything.

13   Obviously I'm trying to recall so these will be

14   estimates.

15       Q.   Sure.

16       A.   In terms of how many I participated in

17   altogether?  I'm going to estimate about probably three

18   dozen, two to three dozen.

19       Q.   How many did you draft draft, perhaps eight to

20   ten?

21           THE VIDEOGRAPHER:  Could we go off record

22       again.

23           THE VIDEOGRAPHER:  Off record at 1:35.

24           (Discussion off the record)

25           THE VIDEOGRAPHER:  We're back on record

1

11

2  at 1:36.

3 Q. How many patents did you draft when you were

4 at Nixon Hargrave?

5 A. I think I answered that question.

6 Q. Can you answer it again?

7   MR. WALDEN:  Objection, asked and

8   answered but go ahead.

9 A. I believe I said eight to ten.

10 Q. I was just trying to -- do you prosecute

11 patents now?

12 A. I -- no, I don't.

13 Q. When was the last time that you worked on a

14 prosecuting a patent?

15 A. The last prosecution experience I had was on

16 reexam and that was probably, estimating again, around

17 the year 2000, 2001.

18 Q. Did you receive any training in prosecuting

19 patents?

20 A. Yes.

21 Q. What type of training did you receive?

22 A. I was trained by working with several partners

23 on prosecution matters who reviewed my work and evaluated

24 it.  I took a number of bar-provided courses or CLE

25 courses on prosecution.

1                                    12

2     Q.   How many courses would you say you took?

3     A.   Well, I know -- what reminds me of this is I

4     have some patent resources courses on my resume and I

5     think there are three of them I recall related to

6     prosecution.  There may have been other courses but I

7     just don't --

8     Q.   Do you recall specifically what the subjects

9     of those three courses were?

10    A.   As I recall, one had to do with chemical

11    patent practice.  Another one had to do with

12    biotechnology patent practice and another one had to do

13    with the amendments to the patent act in 1995 associated

14    with the URAA, the Gap treaty.

15    Q.   When did you take those courses?

16    A.   They were all before I left Nixon Hargrave

17    which was in 1995, I don't recall the exact years.

18    Q.   Have you ever worked at the patent and

19    trademark office?

20    A.   Have I ever worked at?  Ever been employed by

21    do you mean?

22    Q.   Yes?

23    A.   No, I've never been employed by the patent

24    office.

25    Q.   Have you ever examined a patent as a patent

13

2   examiner?

3    A.   No.

4    Q.   Have you ever supervised or trained patent

5   examiners?

6    A.   No.

7    Q.   Were you involved ever in drafting US PTO

8   disclosure rules?

9    A.   No.

10    Q.   After you left Nixon Hargrave, what did you do

11  next?

12    A.   I took a job as a member of the faculty at the

13  Syracuse University college of law where I teach -- I was

14  hired primarily to teach patent law courses.  I was their

15  first patent law professor and I teach in the areas of --

16  I teach currently in the area of patent law.  I have

17  taught patent prosecution.  I designed a patent

18  prosecution course for the university.  I've taught in

19  the area of federal civil litigation and Internet law and

20  I've also continued to consult on patent matters since I

21  left the firm.

22    Q.   What sort of consultation do you do?

23    A.   Now my work primarily involves serving as a

24  consulting expert or a mediator in patent cases, formerly

25  I did -- my work consisted of patent prosecution, patent

1

25

2    materiality or inequitable conduct.

3    Q.   Have you -- scratch that.  You reviewed

4    profession or -- not profession or, Mr. Van Horn's

5    report, correct?

6    A.   Yes.

7    Q.   Do you know professor -- do you know Mr. Van

8    Horn?

9    A.   We may have met along the way.  But I don't --

10   I'm not sure whether I've ever met him.

11   Q.   Would you say that Mr. Van Horn is familiar

12   with patent prosecution practice?

13        MR. WALDEN:  Objection, vague, lack of

14        foundation.

15   A.   I read his declaration so I know what he says

16   in there and I don't have reason to doubt it, what he

17   says.

18   Q.   Would you say he's got more experience in

19   patent prosecution than you do?

20        MR. WALDEN:  Objection, lack of

21        foundation.

22   A.   I have no basis on which to conclude that he

23   has more experience in patent prosecution than I do.

24   Q.   You say that even after reviewing his report?

25   A.   Yes.

1                                    31

2        Q.    How many continuations have you participated

3    in?

4        A.    Again I don't have an exact number.  I will

5    estimate -- by continue weighs do you mean straight

6    continuations, continuations in part, divisionals?

7        Q.    How about all three of them together?

8        A.    I'm just going to estimate perhaps ten to

9    fifteen.

10       Q.    How many continuations have you participated

11   in and by that I mean excluding continuations in part

12   and divisionals

13       A.    Some number less than that because I have

14   worked on both divisionals and continuations in part so

15   half dozen perhaps.

16       Q.    How many continuations in part have you

17   participated in?

18       A.    Again, I don't have an exact number.  Perhaps

19   three or four, maybe five.

20       Q.    How many continuations -- continue weighs in

21   part and divisionals have you drafted?

22       A.    Again I just -- I have to estimate but I'll

23   estimate perhaps four or five.

24       Q.    And how many continuations have you drafted?

25       A.    I thought I that's the question I just answer.

33

2    A.   No, I have not had that conversation.

3    Q.   In your practice participating in and/or

4    drafting continue weighs, did you ever file continuations

5    with claims that had been rejected in a parent

6    application?

7    A.   I don't recall the claims that I filed in any

8    application.

9    Q.   What's your understanding of why an applicant

10   pursues a continuation?

11          MR. WALDEN:  Objection, vague, lack of

12            foundation.  Go ahead if you can answer.

13   A.   Can you repeat the question?

14   Q.   What's your understanding of why an applicant

15   pursues a continuation?

16          MR. WALDEN:  Same objection.

17   A.   Any applicator applicants in general?  What

18   are the --

19   Q.   Applicants in general.

20   A.   It's my understanding that there are a number

21   of reasons that an applicant might pursue a continuation

22   application.  One example would be to -- because the

23   applicant has simply exhausted his or its -- his or her

24   opportunity to argue with the patent examiner over

25   patentability, has received a final rejection and is not

1

2   perhaps ready to appeal or appeal the case in its

3   entirety.  And another example might be to claim subject

4   matter that was disclosed but not claimed in the parent

5   application.  Another example is because the applicant

6   realizes there's information that is required by the duty

7   of candor to be submitted and finds him or herself at a

8   point in prosecution at which it's too late to submit

9   that information and have it considered by the patent

10   office so they might file a continuation for that

11   purpose.  Those are at least some of the examples of

12   reasons why people time continue weighs as I understand

13   it.

14       Q.   Would you characterize the continuation

15   process as a second bite of the am?

16            MR. WALDEN:  Objection.  Vague.

17       A.   I'm not sure what you mean by second bite of

18   the am.

19       Q.   What do you understand second bite of the am

20   to mean when you hear it in everyday speech?

21       A.   Well, I've never thought about what that

22   means.  I guess a second chance perhaps.

23       Q.   Do you think a second bite of the am is meant

24   to be a deserved second chance?

25            MR. WALDEN:  Objection, vague.  What

2    that?

3       Q.   Yes.

4       A.   Well, I'm -- that appears to be what happened

5    in the file histories that I reviewed that belong to CK.

6       Q.   Anyone else?

7       A.   I just don't have recollections of my -- the

8    details in prosecutions I've been involved in or of cases

9    I've been involved in as an expert or litigation, I don't

10   remember those details.

11      Q.   Did you ask any practitioners that they've

12   done that practice?

13      A.   No.

14      Q.   Do patent examiners review the prosecution

15   history of a parent application when they're examining a

16   continuation application?

17            MR. WALDEN:  Objection, lack of

18          foundation.

19      A.   I of course don't know what individual patent

20   examiners do.  I do know that it's my -- based on my

21   understanding of the relevant MPEP provisions there's

22   nothing in the MPEP that requires them to do so.

23      Q.   But you don't actually know whether they do or

24   not?

25      A.   I don't know if anyone knows whether they do

1

43

2   or not but I certainly do not know what each individual

3   examiner's practice is.

4       Q.   Do you recall reading in Mr. Van Horn's expert

5   report that he states that examiners do review the

6   prosecution history of a parent application when they're

7   examining a continuation application?

8           MR. WALDEN:  Objection, objection, lack

9           of foundation.

10      A.   I also think that mesothelioma characterizes

11  his report.

12      A.   I'm going to ask if you can show me where he

13  says that.  I don't recall anything that he says

14  specifically.

15      Q.   Turn to paragraph 59 of his report which is

16  marked as Exhibit 2.

17      A.   Paragraph -- okay.

18      Q.   He states there it is common practice in the

19  PTO for examiners to review the prosecution history and

20  the documents cited therein in one or more parent

21  applications while examining a continuation application.

22  Do you disagree with that?

23      A.   I see that he says it.  I don't have any basis

24  to know one way or the other, only to know what the MPEP

25  says examiners are required to do.

1

47

2    Mr. Van Horn's report?

3        A.   I don't have an understanding of what he means

4    by common practice.

5        Q.   Do you think it's possible that patent

6    examiners have a common practice beyond what is disclosed

7    in the MPEP?

8            MR. WALDEN:  Objection, lack of

9            foundation, vague.

10       A.   A common -- no, I don't -- a common practice

11   with respect to anything?

12       Q.   Yeah.

13       A.   I don't know that I can even answer the

14   question.  I don't know that I understand the question

15   but I'll try again if you ask.

16       Q.   Do you know if it's possible that the patent

17   examiners have any common practices beyond what is

18   disclosed in the MPEP?

19           MR. WALDEN:  Objection, lack of

20           foundation.  Go ahead.

21       A.   I have no way of knowing.

22       Q.   Who would know that?

23       A.

24           MR. SKWRAO:  Objection, lack of

25           foundation.

91

2    existence of the parent.

3    Q.    So there's no provision that says in that

4    situation that the applicant should not rely on the

5    examiner being aware of the parent?

6    A.    Well, I'm not sure about that because if you

7    notice -- well, let me just read the provision.  The

8    paragraph says a lot of things and one of the things that

9    it says, for example, is that it is desirable to be

10    particularly careful that prior art or other information

11    in one application is cited to the examiner in other

12    applications to which it would be material.  I -- I mean

13    the MPEP provision, that sentence does not seem to me to

14    exclude parent/child situations.  I don't know if I've

15    answered the question.

16    Q.    I don't think so.  My question was, was

17    whether the applicant can rely on the examiner to be

18    aware of the parent application when prosecuting the

19    continuation and when the examiner has indicated that

20    he's aware of it?

21    A.    In that circumstance I think the applicant can

22    rely on the examiner to be aware of the existence of the

23    parent application.

24        (Exhibit 5, ^ Description, marked for

25        identification this date.)

1                                                          114

2                    MR. WALDEN:  Objection, lack of conduct.

3        A.   No, like I said, I think several times, I

4    would need to know the entire file history and perhaps

5    the file history of the parent or parents.

6        Q.   Were you ever asked to provide an opinion as

7    to whether any -- whether the applicants of any of the

8    patents in suit in this case, the Color Kinetics TIR case

9    whether they committed inequitable conduct?

10       A.   I have not been asked for that opinion.

11       Q.   Do you have an opinion?

12       A.   I do not have an opinion.

13       Q.   Do you know why you were not asked to do that?

14       A.   I don't know why I wasn't asked.

15       Q.   Were you asked to determine whether any

16   rejection of a claim in a parent application, in one of

17   the patents in suit, was material such that it needed to

18   be disclosed in the continuation?

19       A.   I was not asked for that opinion.

20       Q.   Do you have an opinion on that?

21       A.   I have only sort of a preliminary reaction to

22   reading the file history.  You know, before I would give

23   an opinion or have an opinion, develop an opinion I would

24   need to study those file history in greater detail and

25   probably study the law in greater detail.