IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COLOR KINETICS INCORPORATED,

        Plaintiff

v.

TIR SYSTEMS LTD.,

        Defendant.

Civil Action No.: 1:03-cv-12491 (MEL)

**COLOR KINETICS' MEMORANDUM
IN SUPPORT OF ITS MOTION TO STRIKE CERTAIN PARAGRAPHS
FROM THE EXPERT REPORT OF STEVEN B. CARLSON**

Plaintiff Color Kinetics Incorporated ("Color Kinetics") hereby moves to strike and preclude reliance on paragraphs 30 to 94 of the Initial Expert Report of Steven B. Carlson on Invalidity of the Color Kinetics Patents, as well as all references in the report to that information, on the grounds that those paragraphs, including scores of new prior art references cited therein, are offered in violation of the Court's April 4, 2007 Order Concerning TIR's Motion for an Extension of Expert Discovery (Docket No. 136). The relevant pages of Mr. Carlson's 163 page report are excerpted and attached hereto as Exhibit A.

The April 4, 2007 Order provided that "TIR shall not be permitted to rely on new prior art" in its expert report. TIR is attempting to circumvent that order with an extensive narrative discussion, and a plethora of new prior art references, that it includes under the heading "History of Light and Lighting Controls," which it then incorporates into TIR's invalidity contentions generally and under the guise of information "known to those of skill in the art." This attempt to evade the Court's explicit order must not be permitted.

## BACKGROUND

Following motion practice regarding TIR's choice of Mr. Carlson as their technical expert, the deadline for the filing of expert reports was set by agreement of the parties for February 28, 2007. TIR sought to extend this date almost immediately, citing a family emergency that would render Mr. Carlson unavailable to finalize his report. Color Kinetics agreed to a first extension of the expert report date to March 28, 2007.

Shortly thereafter, TIR again sought to extend the expert report date, this time seeking an additional thirty days to determine whether Mr. Carlson would be available at some point in the future and then a further period of time (up to three months) to complete the report. Color Kinetics, sympathetic to Mr. Carlson's situation, but unwilling to allow TIR to take advantage of delay associated with their expert's family emergency to seek out additional prior art, offered to allow TIR an extension of time <u>on the condition that TIR not introduce new art</u>. TIR rejected this offer, thus validating Color Kinetics' concerns that TIR was trying to use the illness in Mr. Carlson's family to its strategic advantage.

While these events were unfolding, TIR announced that it will be acquired by Royal Philips Electronics N.V., which includes a division known as Philips Lighting B.V. (collectively, "Philips"). (<u>See</u> Docket No. 133, Exhibit B.) On March 13, 2007, immediately before the press release, Philips contacted Color Kinetics, stated that the pending acquisition was going to be announced, that Philips was assuming control of this litigation immediately, and that, if Color Kinetics would not agree to a stay, Philips would be forced to make public what it claimed was new prior art. (<u>See</u> Declaration of Peter Karol, Exhibit B to Docket No. 133.) Philips ignored Color Kinetics' request that Philips provide it with copies of the alleged new prior art. (<u>Id.</u>)

When the parties could not reach agreement on an extension of the March 28, 2007 deadline for filing expert reports, TIR moved for additional time. Color Kinetics made its concerns regarding the potential search for and inclusion of new art by TIR known to the court at this time (see Docket No. 133), and the Court entered the Order proposed by Color Kinetics, which provided that "TIR shall not be permitted to rely on new prior art." See April 4, 2007 Order Concerning TIR's Motion for an Extension of Expert Discovery (Docket No. 136).

Despite this Order expressly and concisely prohibiting TIR from relying on new art in the expert reports, the report prepared by Mr. Carlson is replete with new material.

In particular, the report includes a section titled "History of Light and Lighting Control," paragraphs 30 though 94 of which include a detailed discussion of vast amounts of new information relating to the development of light and lighting that is included for the express purpose (as explained in the introductory paragraphs) of "showing that Color Kinetics' claims merely duplicate lighting and/or lighting control structures and systems already known and used for decades" and to purportedly allow one to "understand why Color Kinetics' asserted claims are anticipated and rendered obvious by the prior art." Report, ¶¶ 28, 29. The material is also cited throughout the report, including in paragraphs 95, 149, 150, 153, 154, 157, 159, 162, 170, 271, 274, and 275.

In addition to paragraph after paragraph of narrative discussion on the history of light and lighting devices since mankind dwelled in caves, the report cites more than thirty specific references, including patents, articles, entire books, and physical things, that purport to support the survey of the prior art.  The new materials include:

U.S. Patent No. 3,293,513

http://www.micro.uiuc.edu/ssdl/

Schubert E.F., <u>Light Emitting Diodes</u> (2d ed. 2006)

Rostky G., "LEDs Cast Monsanto In Unfamiliar Role,"
Electronic Engineering Times, No. 944 (March 10, 1997)

Nick Holonyak: He Saw The Lights, Business Week (May 23, 2005)

U.S. Patent No. 3,760,174 to Boenning

Buol D.A. et al., "Tri-Color LED Drive System,"
IBM Tech. Disclos. Bull. 320-321 (1986)

Craford M.G., "LEDs Challenge the Incandescents,"
IEEE Circuits and Devices 24-29 (Sept. 1992)

Craford M.G., "Visible Light Emitting Diode Technology"
(paper presented at Quantum Electronics and Laser Science Conference,
Anaheim, CA, Vol. 9:28, JCM3 (June 2-7, 1996))

Evans D.L., "High Luminance LEDs Replace Incandescent Lamps in New
Applications," Proc. SPIE Vol. 3002, 142- 153
(paper presented at the SPIE Conference (Feb. 13- 14, 1997))

"Indicators and Displays," Machine Design: 1988 Reference Issue Series,
190-200 (May 18, 1988)

Otsuka W., "Ultrabright LEDs Replace Incandescent Lamps," Laser Focus
World 147-150 (Mar. 1996)

Werner K., "Higher Visibility for LEDs," IEEE Spectrum 30-39 (July 1994)

http://upload. wikimedia.org/wikipedidcommons/thumb/c/cb/
RBG-LED.jpg/3OOpx-RBGLED.jpg

http://www.tower-style.de/medidimages/produkteAaser~led/rgfertig.jpg

http://www.dvtsensors.comlshopcart/highres/IAAS- 1224.jpg

Parker W. et al., <u>Scene Design and Stage Lighting</u> (8th ed. 2003)

U.S. Patent No. 2,920,240 to Macklem

U.S. Patent No. 3,397,344 to Skirpan

Kliegl Bros., <u>Lighting Control Systems</u> (1961)

U.S. Patent No. 3,787,752 to Delay

U.S. Patent No. 4,675,575 to Smith

U.S. Patent No. 5,006,724 to Liu

U.S. Patent No. 5,184,114 to Brown

"Q-File," Thorn Electrical Industries Ltd.

LS-8 memory control system, Electronics Diversified, Inc.

Kliegl "Performance" microprocessor-based PWM control system

Kliegl Performance Sofpatch system

Kliegl K96 Digital Dimming System

Colortran CMX, Electro Controls ECMux,
Avab A240, NSI Microplex, and Teatronics Tmux

Intelligent Power System by Entertainment Technology, Inc.

Huntington J., "The ET Dimmer Test,"
Lighting Dimensions 100 (Oct. 1991)

L86/IR dimming system by Lighting Methods, Inc.

Terry S., "Multipurpose Peripherals," Lighting Dimensions 125 (Apr. 1989)

Rea M. (ed.), <u>Lighting Handbook: Reference and Application</u> (8th ed. 1995)

U.S. Patent No. 3,290,555 to Davis

U.S. Patent No. 3,419,753 to Schultz

Kliegl Bros., Theatrical Lighting, Catalogue No. T-6 1 (1965)

Kliegl Bros., Lighting Control Systems 200-5 (1961)

Howell W., LEDs On Stage And Beyond 14
(presentation given at Live Design International Conference, Las Vegas, 2002)

U.S. Patent 5,530,322 to Ference (in ¶ 161)

McHugh, C., "Concerts," Lighting Dimensions 36-42 (May 1996) (in ¶ 275)

http://www.chriskorin.com/projects/techxtra/Nov2005/images/edison_lamp.jpg

http://www.neon-sionage.com/images/neon_sales/xlarge_neon/G3464A-med.jpg

http://www.yourdictionary.com/images/ahd/jpg/A4flulmp.jpg

http://www.jasons-indoor-guide-to-organic-and-hydroponics-
gardening.com/images/fluorescents-use-this-one.jpg

http://content.answers.com/main/content/wp/en/
thumb/b/be/250px-Compact-Fluorsecent-Bulb.jpg

It is highly inappropriate for TIR to have included this material in Mr. Carlson's report in the face of an order expressly prohibiting the introduction of new prior art in that particular report. For this reason, Color Kinetics requests that it be stricken and that TIR be precluded from relying on it.

## ARGUMENT

In view of the Court's Order that TIR is not "permitted to rely on new prior art" in Mr. Carlson's report, the only questions that need be answered are (a) whether this material is "new prior art" and (b) whether TIR is attempting to rely on it.

For both, the answer clearly is "yes."

### A.     This is New Material

With respect to the newness of the information, there is no question that the substance of this "history" was not disclosed prior to the April 4, 2007 Order. Indeed, the particular references described above have not been produced to Color Kinetics <u>to date</u>. The same is true with respect to the narrative.

For example, none of the following had been alleged or described by TIR prior to the exchange of the expert reports:

- "In 1968, the Monsanto Corporation started mass production of inexpensive red GaAsP LEDs. These LEDs were used to replace incandescent lamps as indicators on electrical and electronic equipment." (¶ 41)

- "From the very beginning of LED development, LEDs were envisioned as replacements for lights in most areas of lighting-displays, signs, industrial applications, and household uses." (¶ 42)

- "Because LEDs consume much less power than incandescent lamps and have extremely long lives (lasting over 50 years), modern LEDs were recognized immediately as the next step in the evolution of artificial light sources." (¶ 43)

- "[I]t has been noted that Dr. Holonyak predicted in the February 1963 issue of Reader's Digest that LEDs would one day displace incandescent light." (¶42)

- "As these high-brightness LEDs reached the market, they were used in new application areas, such as signage and traffic lights." (¶43)

- "Despite the difficulties in developing an efficient blue LED, the scientific community was well aware of the opportunities that would arise once it was developed." (¶ 45)

- "RCA even conceived the idea of a flat-panel television using red, green, and blue LEDs in the 1960s." (¶ 45)

- "As a result of this breakthrough in blue LED technology, many applications that used other light sources could make use of LEDs instead. This does not involve any particular innovation in the area of light use or light control." (¶ 47)

- "[A]s Westinghouse and RCA recognized in the early 1970s and others continued to recognize in the 1980s and 1990s, it simply involves the use of LEDs in lighting structures and lighting control methods that have previously functioned with incandescent or fluorescent light source." (¶ 47)

- "There are many different methods that may be used to implement PWM. The first PWM systems used analog circuitry-combinations of resistors, capacitors, and transistors-and were used in SCR dimmers starting in the late 1950s. Since then, digital techniques have become the dominant design technology, and PWM is now generally implemented by microcomputers using counters and control logic." (¶ 59)

- "In a common implementation of PWM, the microprocessor programs a clock to count out a set range (for example, 0 to 255) within the period of each PWM cycle. This counting, which is repeated for every PWM period, is known as the "timing cycle." The desired duty cycle for the PWM waveform is loaded into digital comparison circuitry. When the counter's value is lower than the programmed PWM value, the PWM waveform is "on"; as soon as the counter value equals or exceeds the desired duty cycle, the PWM waveform switches off until the timing cycle is complete and begins again at zero, or until a new PWM value is received." (¶ 59)

- "In 1958, Kliegl Brothers Universal Electric Stage Lighting Company used PWM to produce a commercial dimmer." (¶ 60)

- "By the 1960s, SCR dimmers using PWM were the standard dimming technology for entertainment lighting applications." (¶ 61)

- "Numerous patents disclose the use of PWM in connection with LED lighting systems." (¶ 62)

- "At the same time as advances in semiconductors enabled the effective use of PWM, developers recognized the usefulness of computer technologies for the control of lighting." (¶ 59)

- In the early 1960s, Thorn Electrical Industries Ltd. in the United Kingdom developed a system, called the "Q-File," which used dedicated circuits to store and recall the information needed to generate analog control signals to drive the PWM circuitry in SCR dimmers for particular lighting levels. (¶ 60)

- "Microprocessors have been an essential component of lighting control in the past 30 years. As is further discussed in Part 1II.C below, numerous other references use microprocessors to control lights, and in particular to implement PWM."  (¶ 73)

- "Another advance in lighting control technology in the late 1970s and early 1980s was the ability to control, from a single console, several different dimming devices networked to the same communications link."  (¶ 74)

- "[D]imming technologies were developed-beginning in the 1960s-that would increase the voltage (and therefore the current) supplied to a light in an inverse non-linear fashion, which the eye would perceive as brightening at a uniform rate."  (¶ 90)

- "The versatility of PWM-based control systems allows lighting designers to integrate new light source technologies without undue difficulty. Thus, starting in the 1960s, PWM systems were used to dim incandescent lights, fluorescent lights, discharge lamps, and neon lamps."  (¶ 93)

- "Artistic License in the U.K. experimented with a DMX-controlled light composed of RGB LEDs, color-mixed to make white light, in 1994."  (¶ 94)

As with the patents, articles, books, and physical things, there is no question that the long narrative by Mr. Carlson, which includes a detailed description of purported facts concerning the development of light generating devices, from fire to LEDs, and of lighting control systems, from reflectors to computer networks and the DMX protocol, is new to the case.

### B.  TIR Intends to Rely on This New Material

Just as there is no question that the material is new, there is no question that TIR and its expert included it for the purpose of relying on it as part of the invalidity case.

Indeed, TIR's refusal to agree to delete this information is all that is needed to show that it intends to rely on it.  Were the information not necessary to TIR's argument, it would not have any reason to complain about it being removed.

TIR will not remove the material, however, because it intends use it as it tries to invalidate the Color Kinetics patent claims.  That much is apparent from the report itself.

The paragraphs of the report that introduce the "History" section (which is part of a section titled "The Basis and Reasons for the Opinions") are unambiguous regarding its purpose.

In paragraph 28, for example, Mr. Carlson states that "[n]one of the matter in the asserted claims of the Color Kinetics patents is new." To support this, he says that "[m]any of Color Kinetics' claims merely duplicate lighting and/or lighting control structures and systems already known and used for decades." Plainly, the "control structures and systems already known and used for decades" are the ones newly described in paragraphs 30-94.

Mr. Carlson further states that "[o]ther claims combine well-known components of such systems in ways that were obvious to those of ordinary skill in the areas of lighting and lighting control." Again, "such systems" are the ones that have appeared in this case for the first time in paragraphs 30-94 of the Mr. Carlson's report.

Similarly, in paragraph 29, Mr. Carlson states that "[i]n order to understand why Color Kinetics' asserted claims are anticipated and rendered obvious by prior art, it is important first to understand the history of lighting and lighting control systems, which I discuss in the following section." Thus, the alleged "prior art" is the purported "history of lighting and lighting control systems" in paragraphs 30-94.

In addition to the introductory paragraphs making clear that the intent is to rely on this material as part of the substantive invalidity case, the other parts of the report do, in fact, rely on it heavily.

In paragraph 96, for example, immediately under the heading "Relevant Prior Art," Mr. Carlson states that "[a]s discussed in [the History of Light and Lighting Control section], lighting control systems using LEDs have been well known and used in numerous prior patents and commercial products."

-10-

In paragraph 149, Mr. Carlson states that "another good source of general information regarding the scope and content of the art at the relevant period is Rea M. (ed.), <u>Lighting Handbook: Reference and Application</u> (8th ed. 1995)." The referenced "<u>Lighting Handbook</u>" is one of the new items found in the "History of Light and Lighting Control" section of the report.

In paragraph 150, Mr. Carlson opines that "a person having ordinary skill in the art, and having the basic knowledge of lighting, such as that outlined in the <u>Lighting Handbook</u>, would recognize that prior art taught several common lighting features that were well-known long before the earliest filing date for any of the patents-in-suit." Thus, in addition to the new <u>Lighting Handbook</u> apparently <u>defining the knowledge of the hypothetical person of skill in the art</u> (from whose perspective obviousness is judged), it appears that the "common lighting features" described in that reference and elsewhere in the new materials also form part of TIR's substantive invalidity case.

In paragraph 153, Mr. Carlson again relies on the new <u>Lighting Handbook</u> as part of the "color LED prior art."

In paragraph 154, Mr. Carlson states that "[a]s is discussed above, red and green LEDs were available in the 1960," a reference to paragraphs 41-45 of the History of Light and Lighting Control.

In paragraph, 157, Mr. Carlson quotes the new <u>Lighting Handbook</u> as teaching that "LEDs can be dimmed by either varying the dc current or pulse-width-modulating the current."

In paragraph, 159, Mr. Carlson again quotes the new <u>Lighting Handbook</u> on the subject of microcomputer control of LEDs.

In paragraph 162, Mr. Carlson again cites the History of Light and Lighting Control section on the subject of the origin of the DMX protocol.

In paragraph 170, under the heading "Analysis of Color Kinetics Patents," Mr. Carlson again relies on the History of Light and Lighting Control section as describing the general state of the art and, more particularly, as disclosing specific features that he claims form the basis of the invalidity argument.

In various subsequent paragraphs, including, for example, 271, 274, and 275, Mr. Carlson asserts that various claim are obvious combinations including the "Color LED Prior Art," which, as explained above, is defined in paragraph 153 to include the new <u>Lighting Handbook.</u>

It is thus apparent from the report itself that TIR and Mr. Carlson intend to rely on the new material contained in paragraphs 30-94 as part of their invalidity case. In fact, there really is no room for any argument to the contrary.

*     *     *

In view of the foregoing, it is clear that TIR is attempting to rely on new prior art in Mr. Carlson's report, which is <u>exactly</u> what it was ordered not to do.

Color Kinetics' concerns about TIR using the additional time to add new art to support its invalidity arguments were justified. Having sought delay for the asserted purpose of allowing its expert to deal with family issues, TIR should not be allowed to use it to try to buttress its inadequate invalidity arguments with newly discovered and disclosed materials.

Under these circumstances, the limited sanction of striking the new material from the expert report and precluding reliance on it is justified.

## CONCLUSION

Because the inclusion of the new material in Mr. Carlson's expert report is in direct violation of this Court's Order of April 4, 2007, Color Kinetics requests that it be stricken from the report and that any testimony and/or evidence relating to the material be excluded.

A Proposed Order is attached hereto as Exhibit B.

Respectfully submitted,

COLOR KINETICS INCORPORATED

Dated: May 23, 2007  by:  /s/ Aaron W. Moore
Matthew B. Lowrie, BBO No. 563,414
Aaron W. Moore, BBO No. 638,076
Thomas P. McNulty, BBO No. 654,564
LOWRIE, LANDO & ANASTASI, LLP
Riverfront Office Park
One Main Street - 11th Floor
Cambridge, MA 02142
Tel : 617-395-7000
Fax: 617-395-7070

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was filed through the ECF system today and should be sent electronically to the registered participants, including those persons listed below.

Mark G. Matuschak, Esq.
mark.matuschak@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

Dated: May 23, 2007  by:  /s/ Aaron W. Moore