Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COLOR KINETICS, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:03-cv-12491-MEL |
| | ) | |
| TIR SYSTEMS LTD, | ) | |
| | ) | |
| Defendant. | ) | |

**INITIAL EXPERT REPORT OF STEVEN B. CARLSON**
**ON INVALIDITY OF THE COLOR KINETICS PATENTS**

## III.    THE BASES AND REASONS FOR OPINIONS

27. As set forth more fully below, it is my opinion that all of the asserted claims of the Color Kinetics patents are invalid on grounds of anticipation, obviousness, and failure to meet the requirements of 35 U.S.C. § 112.

28. None of the matter in the asserted claims of the Color Kinetics patents is new. Many of Color Kinetics' claims merely duplicate lighting and/or lighting control structures and systems already known and used for decades. Other claims combine well-known components of such systems in ways that were obvious to those of ordinary skill in the areas of lighting and lighting control. As a result, the asserted claims are invalid due to anticipation and obviousness.

29. In order to understand why Color Kinetics' asserted claims are anticipated and rendered obvious by prior art, it is important first to understand the history of lighting and lighting control systems, which I discuss in the following section. I then discuss particular prior art references that, in my opinion, most clearly demonstrate the invalidity of the asserted claims.

### A.    History of Light and Lighting Control

#### 1.    _Light Sources_

##### a)    _Early Light Sources_

30. Since long before recorded history, humanity has pursued ways to light its surroundings artificially. The wood fire was the first "artificial" light, and humans soon learned to make lamps that burned other combustible substances, such as grease, oils, and wax. Though better than spending half the day in darkness, these methods had many obvious shortcomings. The light they emitted was uneven; they produced heat and smoke; they were difficult to control; and they presented an enormous fire hazard.

31. In the early 19th century, gas lighting appeared. Gas lights were operated by valves and were therefore much easier to control than candles or oil lamps. Gas lighting still had the disadvantage of open flames, however, and many theatres and other buildings burned down due to gaslight fires.

b)    *Incandescent Lamps*

32. In the second half of the 19th century, large-scale generation of electrical power became practical, and many researchers began to work on the idea of the electric lamp. Thomas Edison delivered the first practical design in 1879. Edison's lamp was "incandescent," meaning that it produced light by heating a material—originally a carbonized cotton thread positioned inside a glass envelope under vacuum—to high temperatures, typically greater than 750 °C. Edison's invention was the first artificial lamp that did not have an open flame or produce smoke. An illustration follows:



(http://www.chriskorin.com/projects/techxtra/Nov2005/images/edison_lamp.jpg)

33. Although electricity quickly replaced gas as the light source of choice, early electric lamps were not particularly efficient or long lasting by modern standards. Lighting

13

developments in the 20th century have typically involved efforts to make electric lights more energy-efficient.

        c)    *Gas Discharge Lamps*

34. One alternative lighting technology was the development of *gas discharge* lamps, which produce light not by heating a material, but by running an electrical current through a gas sealed in a tube. A common example—used for virtually all street lighting and large-scale commercial lighting applications—is high-intensity discharge (HID) lamps, which operate by running an electric current through tungsten electrodes inside a sealed tube filled with a gas and a metal. The electrical discharge (or "arc") causes the metal to vaporize and emit light. HID lamps are more energy-efficient than incandescent sources.

35. Gas discharge tubes are also used to produce colored visible light. For instance, passing an electric current through a sealed tube filled with neon gas produces a bright orange glow. In 1925, tubes containing mercury and argon gas were also used to produce blue light. Placing a yellow filter around a blue tube produced green light. Neon discharge tubes became extremely popular for displays and signage in the first half of the 20th century due to their relatively low power consumption and indefinitely long lifetime:



(http://www.neon-signage.com/images/neon_sale/xlarge_neon/G3464A-med.jpg)

36. Another variation on the gas discharge lamp is the fluorescent tube, first introduced to the public at the New York World's Fair in 1939. A fluorescent light is generally constructed as a long tube that is coated with phosphor and contains a small amount of mercury.



(http://www.yourdictionary.com/images/ahd/jpg/A4flulmp.jpg)  An electric discharge in the tube causes the mercury to emit ultraviolet radiation, which then causes the phosphor to "fluoresce," i.e., absorb the ultraviolet radiation and emit visible light.  Fluorescent lights had a cool, bluish white light that has steadily been improved to warmer, more natural whites.  A typical modern fluorescent tube appears as follows:



(http://www.jasons-indoor-guide-to-organic-and-hydroponics-gardening.com/images/fluorescents-use-this-one.jpg)

37. In the 1980s the compact fluorescent lamp was developed, in which the fluorescent tube is smaller and folded into the shape of an incandescent lamp:

15



(http://content.answers.com/main/content/wp/en/thumb/b/be/250px-Compact-Flourescent-Bulb.jpg)  Fluorescent lamps are more efficient than incandescent lights; a typical 13W compact fluorescent can typically be used to replace a 75W incandescent.

d)      *Electroluminescence and Light-Emitting Diodes (LEDs)*

38. Another significant technological advance, of particular relevance here, was the observation of *electroluminescence*, which occurs when an electric current passes through a solid-state material (as opposed to a gas).  Electroluminescence occurs at room temperature and is different from incandescence, which involves heating a material to high temperatures.

39. Although electroluminescence was first reported in approximately 1907, its use as a reliable light source only began after the invention of semiconductors.  A semiconductor is a solid that conducts electricity but whose conductivity—i.e., the amount of electricity that can flow through the material—can be varied over a wide range.  A semiconductor's conductivity can be changed either permanently (by modifying its physical properties to achieve a desired level of conductivity) or dynamically (by placing a control terminal on the semiconductor that varies the conductivity depending on the voltage or current supplied to the semiconductor).  The

16

conductive properties of semiconductor materials made them particularly good producers of electroluminescence.

40. As different types of semiconductor materials were developed, researchers attempted to use them to build devices whose sole function was to emit light. These efforts centered around diodes, which are electronic devices that conduct electric current in one direction only, like a one-way water valve. In the early 1960s, Biard and Pittman at Texas Instruments produced and patented the first light-emitting diode, or LED, which was a semiconductor diode that emitted light when an electrical signal was applied in the forward (conducting) direction. See U.S. Patent No. 3,293,513 to Biard (filed Aug. 8, 1962 and issued Dec. 20, 1966). That LED, which used the semiconductor gallium arsenide (chemical formula GaAs), emitted infrared light, which is invisible to the human eye.

41. In 1962, Nick Holonyak, Jr., of General Electric Company developed the first practical visible red LED, using gallium arsenide phosphide (GaAsP) as the semiconductor material. See http://www.micro.uiuc.edu/ssdl/ (biography of Nick Holonyak, Jr.). In 1968, the Monsanto Corporation started mass production of inexpensive red GaAsP LEDs. These LEDs were used to replace incandescent lamps as indicators on electrical and electronic equipment. See Schubert E.F., *Light Emitting Diodes* 8 (2d ed. 2006) ("*Light Emitting Diodes*"); Rostky G., "LEDs Cast Monsanto In Unfamiliar Role," Electronic Engineering Times, No. 944 (March 10, 1997), available at http://eetimes.com/anniversary/designclassics/monsanto.html ("Rostky").

42. From the very beginning of LED development, LEDs were envisioned as replacements for lights in most areas of lighting—displays, signs, industrial applications, and household uses. See *Light Emitting Diodes* 8. Because LEDs consume much less power than incandescent lamps and have extremely long lives (lasting over 50 years), modern LEDs were

17

recognized immediately as the next step in the evolution of artificial light sources. See *Light Emitting Diodes* 12-13. Indeed, it has been noted that Dr. Holonyak predicted in the February 1963 issue of *Reader's Digest* that LEDs would one day displace incandescent light. See *Nick Holonyak: He Saw The Lights*, Business Week (May 23, 2005), available at http://www.businessweek.com/magazine/content/05_21/b3934030.htm.

43. In the 1960s, however, LEDs were low in efficiency, and researchers at IBM, RCA, AT&T Bell Labs, and GE actively sought to find better semiconductor materials to increase LED efficiency. Researchers also produced LEDs that emitted light of colors other than red, namely by adding selected impurities to the semiconductor material to change its characteristics (a process known as "doping"). By the late 1960s, red, green, and amber LEDs (sometimes referred to as "RGA" LEDs) had been developed using gallium arsenide phosphide (GaAsP). See Rostky; see also *Light Emitting Diodes* 10-13. These LEDs were both more efficient and less expensive than the earlier red GaAsP LEDs. During the mid-1980s, work on high-efficiency red, green, and amber LEDs progressed with the use of aluminum gallium indium phosphide (AlGaInP) that achieved greater brightness levels. As these high-brightness LEDs reached the market, they were used in new application areas, such as signage and traffic lights.

44. Further LED development in the 1960s faced a major hurdle: researchers had yet to develop a blue LED. A blue LED, combined with existing red and green LEDs, would enable red-green-blue (RGB) color mixing, which can yield all possible colors of visible light, as well as the absence of light, i.e. black (RGB off), and white light (RGB on full). Blue LEDs proved elusive, however, because they required higher energies and a new semiconductor material.

45. Despite the difficulties in developing an efficient blue LED, the scientific community was well aware of the opportunities that would arise once it was developed. For example, a 1973

18

patent belonging to Westinghouse Electric describes a programmable light source using RGB LED color mixing. U.S. Patent No. 3,760,174 to Boenning (issued Sept. 18, 1973). RCA even conceived the idea of a flat-panel television using red, green, and blue LEDs in the 1960s. See *Light Emitting Diodes* 15-16.

46. RCA pursued a blue LED aggressively using gallium nitride (GaN). By 1972, researchers had developed GaN LEDs producing blue and green light, but these devices were extremely inefficient. RCA stopped work on GaN LEDs shortly thereafter. See *Light Emitting Diodes* 15-17. By the early 1990s, however, GaN LEDs emitting blue and ultraviolet light with higher efficiencies were being produced. See *id.* at 17-18. Over the next few years, Shuji Nakamura and Takshi Mukai at the Nichia Chemical Co. made enormous strides in the improvement of blue LEDs using gallium indium nitride (GaInN), developing high-brightness blue LEDs between 1993 and 1995. See *id.* at 18.

47. As a result of this breakthrough in blue LED technology, many applications that used other light sources could make use of LEDs instead. This does not involve any particular innovation in the area of light use or light control. (The lighting control methods discussed in Part III.A.2 below apply equally to all varieties of LED.) Rather, as Westinghouse and RCA recognized in the early 1970s and others continued to recognize in the 1980s and 1990s, it

simply involves the use of LEDs in lighting structures and lighting control methods that have previously functioned with incandescent or fluorescent light sources.[3]

48. Today, LEDs generally consist of one or more semiconductor chips or "dies" connected to a lead frame, leads through which current can flow, as well as packaging (typically some form of polymer encasing). Following are a few illustrations of RGB LEDs:





---

[3] See, e.g., Buol D.A. *et al.*, "Tri-Color LED Drive System," *IBM Tech. Disclos. Bull.* 320-321 (1986); Craford M.G., "LEDs Challenge the Incandescents," *IEEE Circuits and Devices* 24-29 (Sept. 1992); Craford M.G., "Visible Light Emitting Diode Technology" (paper presented at Quantum Electronics and Laser Science Conference, Anaheim, CA, Vol. 9:28, JCM3 (June 2-7, 1996)); Evans D.L., "High Luminance LEDs Replace Incandescent Lamps in New Applications," *Proc. SPIE* Vol. 3002, 142-153 (paper presented at the SPIE Conference (Feb. 13-14, 1997)); "Indicators and Displays," *Machine Design: 1988 Reference Issue Series*, 190-200 (May 18, 1988); Otsuka W., "Ultrabright LEDs Replace Incandescent Lamps," *Laser Focus World* 147-150 (Mar. 1996); Werner K., "Higher Visibility for LEDs," *IEEE Spectrum* 30-39 (July 1994).



(http://upload.wikimedia.org/wikipedia/commons/thumb/c/cb/RBG-LED.jpg/300px-RBG-
LED.jpg; http://www.tower-style.de/media/images/produkte/laser_led/rgfertig.jpg;
http://www.dvtsensors.com/shopcart/highres/IAAS-1224.jpg)

### 2. *Lighting Control*

49. "Lighting control" refers to the task of varying the direction, brightness, and color of light to achieve a desired objective. In the days of candles and oil lamps, lighting control frequently consisted of placing baffles or reflectors in strategic locations to direct the light. As noted above, gas lamps allowed for the adjustment of the lighting level by valves. The advent of electric light after Edison created new challenges and new opportunities in lighting control.

### a) *Early Electric Lighting Control Methods*

50. When electric lights were first used in the 1880s, the most common lighting control was an on-off switch. The ability to turn a light on or off instantaneously was a major advance over gas lamps and other open-flame light sources. But early electric lights also had a particular disadvantage: they could only be on or off and could not be easily brightened or dimmed. By contrast, gas lamps could easily be adjusted by turning the gas up or down.

51. Complex lighting control techniques were often developed for the theater, which had an insatiable demand for lighting applications. An early method for controlling the intensity of

electric light (i.e., brightening and dimming) was the crude "saltwater" dimmer, which varied the amount of electrical power fed to electric lights by altering the distance between two electrodes in a tank of salt water. These dimmers were difficult and dangerous to operate.

52. The electrical resistance dimmer was developed in the early 1900s as an improvement over the saltwater dimmer. A resistance dimmer is a long length of wire, usually wound into a coil. A contact, called a "wiper," is moved along the length of the coiled wire, operated either by hand or by a motor. The movement of the wiper increased or decreased the electrical resistance, which varied the power to the electric lamps:



Parker W. et al., *Scene Design and Stage Lighting* 410 (8th ed. 2003).

53. Though far more effective than the saltwater dimmer, the resistance dimmer was large and heavy and produced a great deal of heat. Moreover, resistance dimmers were usually installed in large metal racks containing several dimmers (usually six). Complex systems of mechanical interlocks allowed a user to control one or more dimmers by moving a single lever, but smooth fades and complicated lighting effects required a great deal of skill on the part of the lighting operator.

b)      *Semiconductors and Pulse Width Modulation (PWM)*

54. Lighting control improved significantly with the development of semiconductors. Although electronic lighting control systems had existed using vacuum tubes, semiconductor components have significant advantages in that they are smaller, cooler, and more durable.

55. In the late 1950s, a semiconductor called a silicon-controlled rectifier (SCR) was developed. The SCR essentially functioned as a high-speed switch that was able to alternate quickly between conducting electricity at full power and not conducting electricity at all. This enabled the control of lighting systems using a technique known as pulse width modulation (PWM). PWM is used in many types of power control equipment, including motor speed controls, power supplies for electronic devices, and lighting. PWM allows for the "modulation" (i.e., variation) of the average amount of current flowing through a circuit by turning the current on and off very quickly for specific intervals of time.

56. For example, consider a light that operates at 100% brightness when powered by 10 amperes of electric current. The light is operated only by an on-off switch. Therefore, at any given moment, it is receiving electric current at either 0% or 100% and is shining at either 0% or 100%. There is no mechanical way to provide current at an intermediate rate (say, 5A) such that the light shines at an intermediate level of brightness (say, 50%). As mentioned above, this was one of the few disadvantages of early electric lamps compared to gas lamps.

57. The PWM technique solves this problem. PWM rests on the principle that, if the light is turned on and off in rapid succession, the *average* current flowing to the light can be varied by changing the relative time periods during which the light is on and off. Thus, if the light powered by 10A spends 50% of the time off and 50% on, the "average" current supplied to the light will be 5A. If the light spends 90% of the time on and 10% of the time off, the average

23

current will be 9A (90% of 10A). Because the light is switched on and off very quickly, the intensity of the light appears to be constant to the human eye.

58. The following diagram shows the basic concept of PWM:



The above illustrations show a single cycle (of duration "T") in which the current is switched on and off. The average current corresponds to the ratio of the length of the on time (shown as "t high") to the length of the off time (shown as "t low") in every wave cycle. That ratio is referred to as a "duty cycle," since it defines the extent of the "duty" of the end device to be in the on position and doing work. Thus, the top diagram shows a 90% duty cycle, where the average

24

power delivered to the light is 90% of full. The middle diagram shows a 50% duty cycle (50% power) and the bottom diagram shows a 10% duty cycle (10% power).

59. There are many different methods that may be used to implement PWM. The first PWM systems used analog circuitry—combinations of resistors, capacitors, and transistors—and were used in SCR dimmers starting in the late 1950s. Since then, digital techniques have become the dominant design technology, and PWM is now generally implemented by microcomputers using counters and control logic. In a common implementation of PWM, the microprocessor programs a clock to count out a set range (for example, 0 to 255) within the period of each PWM cycle. This counting, which is repeated for every PWM period, is known as the "timing cycle." The desired duty cycle for the PWM waveform is loaded into digital comparison circuitry. When the counter's value is lower than the programmed PWM value, the PWM waveform is "on"; as soon as the counter value equals or exceeds the desired duty cycle, the PWM waveform switches off until the timing cycle is complete and begins again at zero, or until a new PWM value is received.[4] Whenever the PWM waveform is in the "on" position, the microprocessor generates an "activation signal," which operates a switch that permits current to flow through the circuit. When the PWM waveform is "off," no current flows. This describes one method of digital PWM generation. Many others are possible.

---

[4] For example, suppose a timing cycle implemented by a clock that counts from 0 to 99 (i.e., 100 increments). In that scenario, a 50% duty cycle would be implemented by programming a PWM value of 50 (i.e., halfway through the timing cycle). When the counter's value is lower than the programmed PWM value—i.e., between 0 and 49—the PWM waveform is on. As soon as the counter value equals the programmed PWM value—i.e. once the counter reaches 50—the PWM waveform switches off and remains off until the counter reaches 99 (or until a new PWM value is received). A 25% duty cycle would be achieved by using a PWM value of 25, such that the PWM waveform would be "on" when the counter was between 0 and 24 and off when the counter was between 25 and 99.

60. In 1958, Kliegl Brothers Universal Electric Stage Lighting Company used PWM to produce a commercial dimmer. See U.S. Patent No. 2,920,240 to Macklem (filed Dec. 8, 1958 and issued Jan. 5, 1960). The PWM circuitry responded to a control signal sent from a remotely-located user-operated controller. Depending on the voltage level of the control signal, the PWM circuitry increased the duty cycle of the PWM waveform. Additional circuitry coupled the PWM signal to the SCRs. When the PWM signal was "on," the SCRs switched on (i.e., conducted electricity)—thus connecting the electric current to the lights. When the PWM signal was in the "off" position, the SCRs did not conduct electricity, thus disconnecting the electric current from the lights.

61. By the 1960s, SCR dimmers using PWM were the standard dimming technology for entertainment lighting applications. For instance, U.S. Patent No. 3,397,344, issued to Skirpan on August 13, 1968 ("Skirpan"), disclosed a PWM system for "finely variably controlling the current supplied to electric lamps to provide a corresponding control of the illumination produced by the lamps." See Skirpan 1:10-13.[5] The Kliegl R66 dimmer also exemplified this type of dimmer in the 1960s and early 1970s. Kliegl Bros., *Lighting Control Systems* 200-5 (1961).

62. Numerous patents disclose the use of PWM in connection with LED lighting systems as well. See, e.g., U.S. Patent No. 3,787,752 to Delay 2:10-15 (issued Jan. 22, 1974); U.S. Patent No. 4,675,575 to Smith 7:6-12 (issued June 23, 1987); U.S. Patent No. 5,006,724 to Liu 2:14-18, cls. 1, 12 (issued Apr. 9, 1991); U.S. Patent No. 5,184,114 to Brown, cls. 34, 35 (issued Feb. 2, 1993).

---

[5] Citations to patents in this report are to column and line in the following format: "[Patent name] [column]:[line range]" or to claim number in the following format: "[Patent name] cl. [claim number]." The patent name is omitted when it is clear from the context.

26

63. As is further detailed in Part III.C.1 below, PWM was also used in the "LED Tower," a decorative lighting device designed and built by Mr. Kevin Furry between 1993 and 1995. A microprocessor in the LED Tower generated a PWM activation signal for each of several LEDs in the Tower. Mr. Furry also conceived and built a separate device, the LED Wheel, prior to 1996, which likewise used PWM to control the intensity of LEDs. See Part III.C.2.

64. PWM was also specifically disclosed in connection with an LED lighting system in United States Patent No. 5,924,784, issued to Chliwnyj on July 20, 1999 ("Chliwnyj"). As is described further in Part III.C.4 below, Chliwnyj disclosed an LED lighting system using LEDs to simulate a flame for decorative or religious purposes. See Chliwnyj 10:39-59, 11:10-21, 13:33-52, 14:11-25. Chliwnyj used PWM signals to vary the current flow to the LEDs, which in turn controls the brightness of the light emitted. Chliwnyj recognized that PWM "is an economical and a very low-power approach to controlling current in electronic circuits" (*id.* 3:17-18) and "is a known function which those skilled in the art can implement in either hardware or code" (*id.* 9:29-31).

65. Indeed, the use of PWM to control LEDs was so well-known that it was even used in applications outside the mainstream lighting and lighting control industry. As is detailed further in Part III.C.3 below, Digitrax, Inc. incorporated LEDs controlled by PWM into model train devices as early as October 1996.

c)    *Use of Low-Side Switches (Current Sinks)*

66. A PWM lighting system generally involves a switch that is "responsive" to the PWM signal. This means that the switch, which may include transistors, resistors, or other components, creates a closed circuit when the PWM signal is "on" (thereby driving current

27

through the circuit) but interrupts the circuit when the PWM signal is off, as the following diagram shows:



67.    In PWM-driven lighting control systems, the switch is often positioned on the so-called "low" side of the light (i.e., between the light and ground), as opposed to the "high" side of the light (i.e., between the power source and the light).[6]  Low-side switches are often referred to as "current sinks" because they pull the current through the circuit by "sinking" it away from the electrical device to the ground.  They are also referred to as "drivers," since they "drive" the current through the circuit.  The following diagram illustrates the basic functioning of a current sink in a lighting control system:

---

[6] A switch on the low side is generally simpler, since the control circuitry and the low side switch operate in the same "low-side" voltage range.  A "high-side" switch requires additional circuitry (and attendant costs) to translate from the low voltage side to the high voltage side.



68.  An illustration of a lighting control system involving multiple LEDs driven by current sinks is provided in a 1977 publication:



Figure 5.1.1.2-2 Equivalent Input and LED Driver Circuits for the Decimal, Hexidecimal and Overrange Displays.

Gage S. et al., *Optoelectronics Applications Manual* at p. 5.7, Fig. 5.1.1.2-2 (1977).  The above figure shows the LEDs (in shadow) coupled on the high side to a power terminal (Vcc).  The

29

figure also shows four current sinks, namely four transistors (represented by bends in the circuit) directly above ground.

d)     *Use of Memory and Microprocessors*

69. At the same time as advances in semiconductors enabled the effective use of PWM, developers recognized the usefulness of computer technologies for the control of lighting.

70. In the early 1960s, Thorn Electrical Industries Ltd. in the United Kingdom developed a system, called the "Q-File," which used dedicated circuits to store and recall the information needed to generate analog control signals to drive the PWM circuitry in SCR dimmers for particular lighting levels. The storage and recall of lighting level information made it possible to change a light from one level to another at the touch of a button, rather than manually "fading" each light up or down.

71. Since the lighting levels could be set in advance and recalled as needed, they were known as "presets" or, sometimes, as "memories." These circuits, or "memory" systems as they came to be known, made lighting control significantly easier. In 1975, the LS-8 memory control system developed by Electronics Diversified, Inc., on which I worked, became the first memory control system using SCR dimmers to be used on Broadway, in the musical "A Chorus Line."

72. By the early 1970s, computer technology had led to the first "microprocessors," tiny semiconductor devices having all of the circuitry of a digital computer in one small package. Microprocessors can store, recall, and compute vast amounts of information at high speed, making it even easier to use PWM lighting presets. In 1977, Kliegl Bros. introduced the first microprocessor-based system for the control of PWM dimmers, called the Kliegl "Performance," which I developed with another colleague.

30

73. Microprocessors have been an essential component of lighting control in the past 30 years. As is further discussed in Part III.C below, numerous other references use microprocessors to control lights, and in particular to implement PWM.

e)    *Networked Lighting Control Systems*

74. Another advance in lighting control technology in the late 1970s and early 1980s was the ability to control, from a single console, several different dimming devices networked to the same communications link.

75. In a complex lighting system, the user invariably wants to control more than one light at a time from the same control console. Early PWM-based systems achieved this goal by having a separate wire extending from the master controller to each separate SCR dimming device, which then generated the appropriate PWM signal for its light. Advances in data communications made it possible to place all of the SCR dimmers on the same "wire"—i.e., on a network—and operate all of them by sending a single control signal along that network that contained the PWM data for each individual dimmer. The ability to communicate control data for all of the PWM dimmers using a single control cable containing one or two pairs of signal wires reduced both the cost of the wire itself and the labor cost of connecting several hundred wires between the control console and the SCR dimmers.

76. The technique for networking SCR dimmers originated in the computer industry, which had been networking computers since the 1960s. Rather than sending multiple data transmissions out to multiple SCR dimmers along multiple connections—a complex and inefficient system—a master computer or "central network controller" sent a single data transmission that included all of the data values for all of the SCR dimmers and transmitted them as a series of data over a single line. This is known as "multiplexing" the signal, a procedure that

31

is still used today. The following diagrams demonstrate the differences between a non-multiplexed and multiplexed system:





77. A central network controller combines the data into a single signal according to a "protocol," which is a set of rules that enables the central network controller to provide different information to several so-called "slave" processors, each of which controls several SCR dimmers.

78. Such lighting protocols often involve the use of "network addresses," which were also inherited from the computing industry. Each slave processor is assigned a particular value

32

as its "address." When the slave processor receives the control signal, it ignores all information except the data that is associated with its own address.

79. In 1978, while working at Kliegl Bros., I and a colleague used this method in the Kliegl Performance Sofpatch system, which was introduced to meet growing demand for larger and more sophisticated lighting control systems. The Sofpatch system had a master network control console that communicated over a high-speed digital communications link to slave processors located in the dimmer room. Each slave processor controlled 96 dimmers. The Sofpatch system used a well-known electrical protocol identified as "RS422."

80. In the Sofpatch system, each slave processor had a "destination address" that directed the processor to particular packets of data within the RS422 protocol. Each slave processor's address was set by small switches called dual in-line package (DIP) switches located on the processor. The first slave processor was set to network address 1, the second slave to network address 2, and so on. By changing the settings of the DIP switches, each slave's address could be altered in order to arrange the dimmers as needed.

81. In 1980, I and a colleague at Kliegl Bros. developed the K96 Digital Dimming System, which also used a microprocessor-based control system and digital PWM electronics. The K96 dimmers used a more sophisticated protocol, known as "RS485," which allowed for more devices to be connected to the network and also allowed the master network controller console to receive status information (such as operating temperature and line voltage) back from the dimmers. Again, the slave processors in the K96 system had alterable network addresses, which allowed each processor to decode its particular data from the signal broadcast over the network.

33

82. Since that time, many other systems have taken advantage of networking technology to simplify and enhance lighting control. As the next section explains, networked control of lights is so common that industry standards have been developed to facilitate its use.

      f)    *Development of DMX512, The Standard Lighting Control Protocol*

83. In the early 1980s, many lighting manufacturers developed their own proprietary protocols for use in their lighting control systems. For example, Colortran called its protocol CMX, Electro Controls had ECMux, Avab had A240, NSI had MicroPlex, and Teatronics had Tmux, to mention just a few. While these different protocols were based on similar networking principles, they were not compatible with each other.

84. Initially, protocol incompatibility was not a problem, because most installations used equipment from a single lighting manufacturer. As the lighting market grew, however, more and more customers (particularly Broadway theatres and theatres that hosted touring shows) required equipment from different manufacturers, which made it imperative that a console from Company A be able to operate a dimmer rack from Company B.

85. In 1986, Mr. Steve Terry—who was a member of the Engineering Commission of the USITT, a nationwide organization of technical theatre professionals—asked me to coauthor, with him and others, a standard digital lighting control protocol. We developed a standard protocol, based on a variation of the Colortran CMX protocol, entitled "DMX512 – Digital Data Transmission Standard for Dimmers and Controllers."

86. Our goal as the authors of DMX512 was to create a "lowest-common denominator" protocol that would be extremely simple in operation and implementation. Thus, many features of more sophisticated protocols, such as source and destination addressing and error-detection and correction, were considered too complex for DMX512. The DMX512 protocol differs from

34

some earlier protocols in that the control signal, strictly speaking, does not contain data corresponding to "addresses" of the slave processors. Instead, each slave processor is programmed to respond only to data located in specific bytes in the DMX512 signal. This is sometimes referred to as "implicit addressing." Accordingly, it is not uncommon to refer to slave processors in DMX systems as having "addresses," referring to the location in the DMX512 data stream where the data directed to that slave processor begins. As with prior systems, many DMX512 systems include slave processors with alterable addresses.

87. For example, the Intelligent Power System, designed by my company Entertainment Technology, had several buttons to allow the user to change the DMX512 "address" of the networked dimming devices. See Huntington J., "The ET Dimmer Test," *Lighting Dimensions* 100 (Oct. 1991). The L86/IR dimming system by Lighting Methods Inc. likewise used the DMX512 protocol with alterable addresses. See Terry S., "Multipurpose Peripherals," *Lighting Dimensions* 125 (Apr. 1989).

88. Because DMX512 was envisioned as a "lowest-common denominator," it was expected that vendors would support DMX512 in addition to their own proprietary protocols. However, most manufacturers ultimately eliminated proprietary protocols in favor of DMX512. The DMX512 standard was updated in 1990 and remains the primary standard control protocol for PWM-based lighting control systems. Indeed, DMX512 may be and has been used to control virtually any electric device in a network.

g)    *Compensation for Non-Linear Perception of Changes in Brightness*

89. One problem in lighting control is that the human eye perceives changes in brightness in a "nonlinear" fashion. A light that increases in intensity at a uniform rate will nonetheless

35

appear to the human eye to brighten very quickly at first and then more slowly as it increases in

brightness. In other words, the human eye is more sensitive to changes in light intensity at lower

light levels—when it is darker, a slight increase in light will be perceived as more significant

compared to the same slight increase when it is brighter. The following graph plots the nonlinear

relationship between the actual increase in brightness and the perceived increase in brightness:



**Fig. 31·3.** Square Law Curve — A presumed relationship between perceived illuminance and measured illuminance.

Rea M. (ed.), *Lighting Handbook: Reference and Application* 862 Fig. 31-3 (8th ed. 1995). This

phenomenon is usually referred to as the "square law," because the eye's perception of changes

in brightness is not linear, but rather follows an exponential, or square, curve. See, e.g., Skirpan

5:47-49 ("[T]he human eye does not respond in a linear relationship to change in light intensity

but follows approximately a square law curve.").

90. In order to compensate for this, dimming technologies were developed—beginning in the 1960s—that would increase the voltage (and therefore the current) supplied to a light in an inverse non-linear fashion, which the eye would perceive as brightening at a uniform rate. As Skirpan again explained in a patent issued in 1968, "the relationship between the magnitude of the control signal and the light output follows a square law relationship. Such relationship is ideal because it provides a linear relationship between the magnitude of the control signal and the amount of light perceived by the human eye." Skirpan 5:42-47.

91. Figure 2 of the Skirpan patent, reproduced below, illustrates this relationship: by increasing the voltage in a non-linear fashion (curve "B"), the light produced appears to the eye to be increasing at a uniform, linear rate (curve "A"):



92. Several other U.S. Patents disclosed this technique of non-linear compensation. See, e.g., U.S. Patent No. 3,290,555 to Davis 1:19-28 (issued Dec. 6, 1966); U.S. Patent No. 3,419,753 to Schultz 1:59-61 (issued Dec. 31, 1968). Kliegl Bros. also included this technique in a catalogue published in 1965. See Kliegl Bros., *Theatrical Lighting*, Catalogue No. T-61, at 43 (1965). As is discussed more fully in Parts III.C.11 and III.C.12, other references specifically disclosed lighting systems applying these compensation techniques to LED illumination units.

h)   *Substitutability of Light Sources in Lighting Control Systems*

93. All of the lighting control systems I have described function without regard to the type of light sources used. The versatility of PWM-based control systems allows lighting designers to integrate new light source technologies without undue difficulty. Thus, starting in the 1960s, PWM systems were used to dim incandescent lights, fluorescent lights, discharge lamps, and neon lamps. See, e.g., Kliegl Bros., *Lighting Control Systems* 200-5 (1961).

94. There is nothing about LEDs that made them unsuitable for use in the PWM-based systems described above. As early as 1977, a well-known reference work explained that LED brightness could be varied using PWM to vary an LED's duty cycle (see Gage S. et al., *Optoelectronics Applications Manual* at p. 5.9 (1977)) and disclosed an LED illumination system using current sinks that respond to PWM signals (see *id.* pp. 5.7, 5.22-5.25). Artistic Licence in the U.K. experimented with a DMX-controlled light composed of RGB LEDs, color-mixed to make white light, in 1994. See Howell W., *LEDs On Stage And Beyond* 14 (presentation given at Live Design International Conference, Las Vegas, 2002), available at http://www.artisticlicence.com/app%20notes/appnote015.pdf. Although the LEDs available at the time were not bright enough for all lighting applications, the availability of brighter LEDs (red, blue, and green) after 1994 made such applications—long since conceived—practicable. Thus, U.S. Patent No. 5,420,482 to Phares, filed in 1994, disclosed a networked control system including red, green, and blue light elements. See Part III.C.5.

## B.   Level Of Skill In The Art

95. A person of ordinary skill in the art of lighting control systems during the period from 1990 to 2000 would typically have had at least a baccalaureate degree in electrical or mechanical engineering, physics, or computer science, and at least three (3) years of experience working

with lighting control systems, power control electronics, and lighting system design. The person of ordinary skill in the art during the period from 1990 to 2000 would be familiar with and have had access to prior art illumination techniques and systems and would be familiar with systems and techniques used at the time.

**C.    Relevant Prior Art**

96. As discussed in Part II.A.2 above, lighting control systems using LEDs have been well known and used in numerous prior patents and commercial products. In my opinion, several particular prior art references disclose the essential elements of the illumination systems and methods in the Color Kinetics patents. In this section, I summarize in greater detail the prior art references that I conclude most clearly anticipate and render obvious the asserted claims.

1.    *The LED Tower*

97. An LED illumination device called the "LED Tower"—designed and built by Mr. Kevin Furry of LED Effects, Inc. ("LED Effects")—possessed many of the characteristics discussed above and claimed in the Color Kinetics patents. The LED Tower was a decorative illumination device consisting of red and amber LEDs arranged in a tower formation, six feet tall by one foot in diameter. See Furry Dep. 23:8-12, 115:3-10, 323:25.[7] The following illustration depicts the LED Tower:

---

[7] Deposition testimony is cited in this report by page number and line, in the following format: "[Witness name] Dep. [page]:[line range]." Deposition exhibits are cited as "[Witness name] Dep. Ex. [exhibit number]." Where a specific page of an exhibit is referenced, the page's control number or "Bates number" is included in a parenthetical after the exhibit number.

discloses the conversion of dimming data inputs into nonlinear PWM outputs to the LEDs.  See ¶¶ 0012, 0029-0041; Fig. 3.

### 12.   *Japanese Patent Application No. H10-133615 to Chiu*

147.    Japanese Patent Application No. H10-133615 to Chiu, published May 22, 1998 ("Chiu"), describes a system and method to control the dimming of LEDs in a digitally encoded image to make the image more accurate to the human eye.  Like the Nagai application, Chiu recognizes that the human eye perceives changes in luminance in a nonlinear fashion.

148.    The Chiu application describes a lighting controller that is able to compensate, through PWM control of LEDs, for the nonlinear perception of the human eye to the change in brightness of an illumination device.  See Chiu, p. 1 Abstract; ¶¶ 0008-0009.  The nonlinear correction is accomplished by adjusting the linear data input into a nonlinear PWM output signal using a table stored in the controller's memory.  See Fig. 2; ¶¶ 0017-0018.  Chiu accordingly discloses a controller, PWM component, and memory.  See ¶¶ 0005-0008, 0011-0019.

### D.    **Common Lighting Features In Prior Art**

149.    I have outlined the major pieces of prior art above.  In addition to what is stated above, another good source of general information regarding the scope and content of the art at the relevant period is Rea M. (ed.), *Lighting Handbook: Reference and Application* (8th ed. 1995).  This standard reference book is periodically published by the Illuminating Engineering Society of North America (IESNA) and provides persons of ordinary skill in the art with easy access to technical lighting information.  Specifically, the *Lighting Handbook* explains, among other things, (a) the science of lighting; (b) basics of lighting engineering, including light sources, luminaire design, and lighting calculations; (c) lighting applications, including theatre lighting and exterior lighting; and (d) lighting control strategies, techniques and equipment.  The

*Lighting Handbook* contains a subchapter on "Light Emitting Diodes" in its chapter entitled "Light Sources." See *Lighting Handbook* 237-240.

150.    It is my opinion that a person having ordinary skill in the art, and having the basic knowledge of lighting, such as that outlined in the *Lighting Handbook,* would recognize that prior art taught several common lighting features that were well-known long before the earliest filing date for any of the patents-in-suit.[16] As is shown more fully below, each of the dozens of asserted claims in the Color Kinetics patents is an assemblage of features common to lighting systems, and the limitations are found in *numerous* prior art references.

151.    Following is a listing of some of the many references that teach the elements in the asserted claims:

### 1.    *Color LED Prior Art*

152.    A common feature found in the asserted claims is the inclusion of LED light sources producing light of a particular color.  LEDs producing light of a particular color are well-known in the art, as Color Kinetics itself acknowledges in the "Background of the Invention" section of its patents, which refers to "the three color LEDs in Phares." '038 Patent 1:25.

153.    The *Lighting Handbook* further explains that:

> LEDs emit radiation when forward biased.  The emitted radiation can be either infrared or visible.  Semiconductor light sources are available in a wide range of wavelengths, extending from the short-wavelength region of the visible spectrum to the far infrared.  Multiple-color lamps are created by combining the light from materials emitting different wavelengths.

*Lighting Handbook* 237.

---

[16] I am informed and understand that the earliest filing date is that of the '038 Patent, filed on August 26, 1997.

154.    Prior art references also describe using LEDs of primary colors (red, green, or blue). Persons of ordinary skill in the art recognized the importance of primary color light sources because mixing light of those colors enables creation of the greatest variety in the resulting mixed light. As is discussed above, red and green LEDs were available in the 1960s. Blue LEDs were contemplated at that time and developed soon thereafter, although their efficiencies were low and costs high until the early 1990s. A person of ordinary skill in the art would recognize that an LED lighting system would function in exactly the same way regardless of the color of the LEDs used and would therefore have obviously substituted LEDs of different colors, including primary colors, into existing lighting systems depending on the desired lighting effect.

155.    The following prior art references (the "Color LED Prior Art") disclose LEDs as sources of colored light. Those marked with an asterisk (*) also include the use of LEDs of one or more primary colors (the "Primary Color LED Prior Art"):

            LED Tower*
            LED Wheel*
            Digitrax FX Decoders
            Digitrax Throttles*
            Chliwnyj*
            Phares*
            Hed*
            Kennedy
            Turnbull
            Stanhope
            Nagai
            Chiu
            U.S. Patent No. 4,845,481 to Havel
            U.S. Patent No. 5,184,114 to Brown

62

2.    *PWM Prior Art*

156.    A common limitation found in many of the asserted claims is the use of PWM to control the amount of current provided to LEDs in a system. The "Background of the Invention" section of the Color Kinetics patents acknowledges that Havel discloses the use of "a pulse width modulated signal to provide current to respective LEDs." See, e.g., '774 Patent 1:47-49.

157.    The *Lighting Handbook* likewise teaches that "LEDs can be dimmed by either varying the dc current or pulse-width-modulating the current." *Lighting Handbook* 239.

158.    The following prior art references (the "PWM Prior Art") disclose using PWM to control the amount of current provided to an LED:

> LED Tower
> LED Wheel
> Digitrax
> Chliwnyj
> Kennedy
> Turnbull
> Stanhope
> Nagai
> Chiu
> U.S. Patent No. 3,787,752 to Delay
> U.S. Patent No. 4,675,575 to Smith
> U.S. Patent No. 5,006,724 to Liu
> U.S. Patent No. 5,184,114 to Brown

3.    *Addressable Controller/Alterable Address Prior Art*

159.    Another common limitation found in many of the asserted claims is the use of a "processor" or "controller" to, among other things, control the amount of current provided to a LED in a system. A person of ordinary skill in the art would be well familiar with the use of a microprocessor—whether referred to as a microprocessor, processor, computer, or controller—to control the amount of current to many different kinds of light sources, including LEDs. See *Lighting Handbook* 859-874 (Ch. 31, "Lighting Controls"). Each of the PWM Prior Art

63

references necessarily includes a controller to control the generation of the PWM signal, which determines the amount of current supplied to the LEDs. In addition, prior art references that disclose the control of current to LEDs using techniques other than PWM obviously also disclose controllers.

160.    When controllers are networked, they are frequently "addressable," in that a network signal may specify bytes of data destined for particular controllers. In many of the network systems described, the "addressable controllers" also have an "alterable address," which means that each controller's address may be changed as needed to maximize flexibility and permit easy removal and insertion of controllers in a particular network.

161.    The following prior art references (the "Addressable Controller Prior Art") disclose using addressable controllers in the form of processors to control the amount of current provided to a lighting system. Within this category, those disclosing or including addressable controllers with alterable addresses are marked with an asterisk (the "Alterable Address Prior Art"):

> LED Tower*
> LED Wheel*
> Digitrax (DT100 throttle*)
> Phares*
> Chansky*
> U.S. Patent No. 5,209,560 to Taylor
> U.S. Patent No. 5,530,322 to Ference

### 4.    *Networking And DMX Prior Art*

162.    Another common limitation found in many of the asserted claims is the use of a networked system of controllers that are in turn controlled by a central network controller using a serial network protocol. Some of the claims specify that the central network computer uses the DMX512 network protocol to communicate with the several individual controllers. As is

64

explained in Part III.A.2.f, the DMX protocol was first promulgated in 1986 and updated in 1990. The DMX protocol is not limited in its application to any particular kind of light source. This is because, as a person of ordinary skill in the art would recognize, the DMX network protocol functions identically regardless of what electric light source is ultimately controlled via the network.

163.   A person of ordinary skill in the art would recognize that the prior art was replete with lighting networks. The following prior art references (the "Networking Prior Art") disclose networked lighting systems. Within this category, those marked with asterisks use the DMX512 protocol (the "DMX Prior Art"):

> LED Tower
> LED Wheel
> Digitrax
> Phares
> Chansky*
> USITT Engineering Commission, DMX512/1990 Digital Data Transmission Standard for Dimmers and Controllers*

### 5.   *Current Sink Prior Art*

164.   Another limitation found in several of the claims of the '038, '774 and '659 Patents requires a current sink coupled to the light source. As discussed in Part III.A.2.c above, "current sink" is another name for low-side switches that have been commonly used in PWM systems for decades.

165.   The following prior art references (the "Current Sink Prior Art") disclose using a low-side switch as a current sink:

> LED Tower
> LED Wheel
> Digitrax
> Chliwnyj
> Gage et al., *Optoelectronics Applications Manual*

## IV.    ANALYSIS OF COLOR KINETICS PATENTS

170.    As the discussion in Part III shows, lighting control systems had reached an advanced stage by the mid-1990s. Persons of ordinary skill in the art knew how to develop LED illumination devices that allowed for control of LED color and intensity through the use of microprocessors and PWM. Such devices could also be networked by using a serial protocol that either included data corresponding to the addresses of multiple addressable illumination units with alterable addresses or—like the DMX512 standard—accomplished the same result using implicit addressing. Dimming technology also existed that accounted for the human eye's anomalous perception of changes in light intensity.

171.    Moreover, those of ordinary skill in the art have also long been aware that LEDs could be employed in the same lighting applications and systems as other light sources. As early as the 1960s, it was known that LEDs could replace incandescent and fluorescent light sources in virtually any use, and would be highly advantageous given their long life and high efficiency. The main obstacle was the development of the high-brightness blue LED, which eluded scientists until the 1990s. But while the development of a practical blue LED was a major breakthrough, the substitution of blue LEDs in well-known applications was obvious and, indeed, had long been contemplated by those of ordinary skill in the art.

172.    In my opinion, the asserted claims of the Color Kinetics patents do not contain any invention that had not been previously disclosed or would not have been obvious to one of ordinary skill in the art. Rather, Color Kinetics has taken various elements that have been well-known in the lighting and lighting control industries and combined them in various permutations with LEDs. Color Kinetics' combinations were obvious to those of ordinary skill in the art given the known advantages of the various components, including LEDs, PWM, networking, the

67

network for applications that merely require turning on and off a single unit, such as lighting a room. One of ordinary skill in the art would immediately recognize that such a control method could be included with the LED Tower and/or Wheel, and would be motivated to combine those inventions with the teaching in the Adjustment Means Prior Art.

270.    It is therefore my opinion that claim 102 of the '011 Patent and claim 12 of the '659 Patent are obvious over the LED Tower and/or LED Wheel in view of the Adjustment Means Prior Art, including but not limited to Chansky and/or Chliwnyj.

2.    ***Claims Rendered Obvious By The Combination Of Phares (Or Other Alterable Address Prior Art) With Chliwnyj (Or Other Prior Art)***

271.    As is set out in the claim charts attached as Appendix A, it is my opinion that claims 15 and 16 of the '659 Patent; claims 1, 2, and 3 of the '038 Patent; and claims 1 and 2 of the '774 Patent are obvious over Phares in view of Chliwnyj. More broadly, these claims are also rendered obvious by combinations of the Alterable Address Prior Art and the Color LED Prior Art, PWM Prior Art, and/or Current Sink Prior Art.

a)    *Claims 1, 2, 3, 15, and 16 of the '659 Patent*

272.    In my opinion, claims 15 and 16 of the '659 Patent are obvious over Phares (or other Alterable Address Prior Art) in view of Chliwnyj (or other PWM Prior Art). Phares discloses multi-colored LEDs controlled by an addressable controller having an alterable address; a network interface; and a network of multiple controllers. Chliwnyj discloses using PWM to generate the activation signal that controls the intensity of the LEDs.

273.    One of ordinary skill in the art would have been motivated to combine the networked lighting system taught in the Alterable Address Prior Art (including but not limited to Phares) with the PWM-based LED illumination system disclosed in the PWM Prior Art (including but not limited to Chliwnyj), because PWM allows for more precise control of LEDs

110

than the system disclosed in Phares. Accordingly, it is my opinion that claims 15 and 16 of the '659 Patent are obvious over the prior art, including but not limited to Chliwnyj and Phares.

274.    The fact that Phares does not specifically reference LEDs is unimportant, since a person of ordinary skill in the art would read Phares as disclosing an LED system. Indeed, Color Kinetics' own patents make this clear. However, if Phares is not found to disclose LEDs, it is my opinion that the claims are nonetheless obvious due to the disclosure of LEDs in Chliwnyj (and other LED Prior Art). One of ordinary skill in the art would have been motivated to combine a lighting system including addressable controllers with LED illumination systems disclosed in the LED Prior Art. As I described above, see Part III.A.2, those of skill in the art have been seeking to increase the intensity and energy efficiency of lighting systems since the advent of electric light, if not before. Since their development, LEDs have been recognized as the next evolutionary step in the advancement of lighting technology. One seeking to increase the efficiency of a networked lighting system, such as that disclosed in Phares or the other Alterable Address Prior Art, would naturally have substituted LEDs for another light source. Such a person could have consulted any reference in the Color LED Prior Art including, as an example, Chliwnyj.

275.    The reverse situation is also true. One of ordinary skill in the art possessed of a single illumination unit, such as the one disclosed in Chliwnyj or other Color LED Prior Art, would have been motivated to control several of them at once for convenience and to attain greater diversity of lighting effects. For example, the LED illumination units disclosed in Chliwnyj could be used in large numbers in theatres, concert venues, or churches, or at any event in which simulated flame effects are desired. However, the economic value of the illumination units is limited because a large number of units cannot be efficiently and rapidly controlled for

111

entertainment purposes or to make a dramatic visual impact. For these reasons, one of ordinary skill in the art would have looked for a mechanism to control many illumination units at once to improve their potential value. It has been common to control individual lighting units from a single source to improve entertainment and lighting effects in a room or at an event. See, e.g., McHugh C., "Concerts," *Lighting Dimensions* 36-42 (May 1996). Phares discloses addressable controllers and networking of illumination units having addressable controllers. The network controllers give different control commands to a large number of units from a single source rapidly and efficiently. If one of ordinary skill in the art had desired to network the illumination system taught in Chliwnyj, he would have looked to the Alterable Address Prior Art, such as Phares, that teach networking lighting systems by providing the controller of each light with a unique and alterable address. Accordingly, it is my opinion that claims 15 and 16 are obvious over prior art.

276.    Finally, claims 1, 2, and 3 of the '659 Patent are also obvious over Phares (or other Alterable Address Art) in view of Chliwnyj (or other PWM Art). The asserted claims generally relate to networked illumination systems having an addressable controller with an alterable address and at least two LEDs coupled to a switch. Phares discloses a networked illumination system having addressable controllers with alterable addresses for controlling the intensity of lights. Phares also teaches a system having network interfaces for receiving address information and lighting information. In turn, Chliwnyj (like other PWM Prior Art) discloses LEDs controlled by a microprocessor using PWM. The combination of Phares (or other Alterable Address Art) and Chliwnyj (or other PWM Prior Art) discloses all of the elements of claims 1, 2, and 3 of the '659 Patent, and therefore renders those claims obvious.

112